**Vincent FERRARA**

v.

**UNITED STATES of America**

**No. Civ. 00–11693–MLW.**

United States District Court, D. Massachusetts.

April 12, 2005.

David Z. Chesnoff, Las Vegas, NV, David A. Nickerson, San Rafael, CA, Martin G. Weinberg, Boston, MA, for Vincent M. Ferrara.

James F. Lang, Robert E. Richardson, Boston, MA, for United States of America.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

TABLE OF CONTENTS

I.   SUMMARY .....................................................387

II.  FACTS .......................................................390

III. ANALYSIS ....................................................408
     A.   Summary of Analysis .....................................408
     B.   Ferrara Has Stated A Claim On Which Relief May Be Granted And That
          Claim Is Not Barred By The *Teague v. Lane* Doctrine....................410
     C.   The Reasonable Probability Standard Applies ...........................421
     D.   Ferrara Was Denied Due Process And Is Entitled To Relief ...............423
     E.   Remedy ...............................................433

IV.  CONCLUSION..................................................440

V.   ORDER ......................................................441

## I. SUMMARY

This is the latest—and hopefully the last—in a series of related cases that have demonstrated extraordinary misconduct by the Department of Justice in its investigation and prosecution of members of the Patriarca Family of La Cosa Nostra (the "LCN"). *See, e.g., United States v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999); *United States v. Flemmi*, 195 F.Supp.2d 243 (D.Mass.2001); *United States v. Connolly*, 341 F.3d 16 (1st Cir.2003). In this case, petitioner Vincent Ferrara has proven that he was denied Due Process when the government, led by Assistant United States Attorney Jeffrey Auerhahn, violated its clearly established constitutional duty to disclose to him, before trial, important exculpatory information that directly negated his guilt on charges that he had directed his codefendant Pasquale Barone to murder Vincent James Limoli.

More specifically, the government did not disclose that Walter Jordan, the only source of direct evidence on those charges, had told the government at least twice that Barone told him that Ferrara had *not* ordered the Limoli murder, and that Barone and Jordan had to flee Boston because Ferrara was going to kill them for murdering Limoli without his permission. Jordan provided this information to Auerhahn's colleague, Boston Police Detective Martin Coleman, and then repeated it for Coleman and Auerhahn. Jordan's statements were memorialized in a contemporaneous memorandum, handwritten by Coleman, which was given to Auerhahn but not produced to Ferrara and his codefendants in connection with their trials and sentencings in 1992, 1993, 1994 and 1995. Rather,

the memorandum, and the information it contained, were disclosed for the first time during the evidentiary hearings concerning Ferrara and Barone's petitions for habeas corpus that were conducted in September 2003.

In the context of this case, the information that the government improperly withheld was highly material. The government was very interested in proving that Limoli was killed as part of Ferrara's racketeering activity on behalf of the Patriarca Family. Ferrara was about 40 years old when he was indicted in 1989. If he was convicted of the Limoli murder charges, or held responsible for them as relevant conduct at sentencing, the Guideline range for his sentence would be raised from possibly as little as 151 months to life in prison. In addition, if the Limoli murder could be proved to be an LCN "hit," it had the potential to raise the sentence for the Boss of the Family, Ferrara's codefendant Raymond J. Patriarca, from about seven years to life in prison.

In its Trial Brief, the government informed Ferrara, Patriarca, Barone, and their codefendants that Jordan would testify that Ferrara had directed Barone to murder Limoli. Jordan testified to that effect at Barone's trial. Based almost exclusively on Jordan's testimony, in October 1993, Barone was convicted of conspiring with Ferrara to kill Limoli. Barone was sentenced to life in prison for that crime.

In January 1992, after the commencement of their trial, Ferrara and his codefendants, except for Patriarca and Barone, entered into linked, binding plea agreements. The plea agreements provided important benefits to the government, including eliminating the need for a lengthy trial, assuring the defendants' convictions, providing long sentences for them, and preserving the confidentiality of fearful witnesses. *See United States v. Carrozza,* 807 F.Supp. 156, 161 (D.Mass.1992). In

return, the defendants were to be given what were deemed to be significant downward departures. For example, Joseph Russo, the Consigliere of the Patriarca Family who accepted responsibility for murdering Joseph Barboza, was provided a downward departure from life to sixteen years in prison.

Ferrara pled guilty to the Limoli murder charges, among others. These charges raised the Guideline range for his sentence to life in prison. His plea agreement provided for a substantial downward departure to a twenty-two year sentence. However, shortly after pleading guilty, Ferrara informed the Probation Department that he had not been involved in the Limoli murder, but pled guilty to those charges because he was in an "untenable" position. The court now understands that Ferrara's position was "untenable" because he felt compelled to plead guilty to the Limoli murder charges or face a real risk of what he adamantly asserts would have been a wrongful conviction resulting in a life sentence. The court did not address this issue at Ferrara's sentencing. In accepting the linked, binding plea agreements, the court sentenced Ferrara to serve twenty-two years in prison after finding that sentence was a well-justified and reasonable downward departure.

The discovery in 2003 that the government had withheld Jordan's repeated statements that Barone had asserted that Ferrara had not ordered the Limoli murder, and the related ruling that Barone had therefore been denied Due Process, led to Barone's prompt release from prison, pursuant to an agreement with the government. The government has argued, however, that Ferrara's guilty plea deprives him of any right to relief for the same serious misconduct the court has found in his case. This contention is incorrect.

A guilty plea generally extinguishes a defendant's right to collaterally attack *independent* claims of constitutional violations that do not relate to actual guilt. *See e.g., Tollett v. Henderson,* 411 U.S. 258, 266, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). A guilty plea does not deprive a defendant of his right to relief where, as here, he demonstrates that misrepresentation or other impermissible conduct by the government deprived him of his ability to decide intelligently whether to plead guilty. *See Brady v. United States,* 397 U.S. 742, 757, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

As many Circuits have recognized, in *Brady v. United States,* 397 U.S. at 757–58, 90 S.Ct. 1463, the Supreme Court authorized collateral relief for cases in which there is proven government misconduct that creates a reasonable probability that an innocent individual, advised by competent counsel, has falsely pled guilty to avert the risk of a wrongful conviction and a much longer sentence. This is such a case.

The government's failure to disclose Jordan's statements that Ferrara had not ordered the Limoli murder utterly undermines the court's confidence in the outcome of Ferrara's case. The court now seriously doubts that Ferrara ordered Barone to kill Limoli. In any event, if the required disclosures concerning Jordan's statements had been made, there is a reasonable probability that Ferrara would not have pled guilty to the Limoli murder charges, would not have been convicted of them or of any other racketeering act involving murder, and would not have been held responsible for any murders at sentencing.[1] In view of the compelling reasons for the linked, binding plea agreements providing for downward departures for Ferrara and his codefendants, there is also a reasonable probability that the government and Ferrara would have resolved his case by agreeing to a sentence of much less than twenty-two years if the required disclosures concerning Jordan had been made. Therefore, Ferrara is entitled to appropriate, equitable relief.

This conclusion is not altered by the fact that collateral relief cannot be granted in a case announcing a new constitutional rule. *See Teague v. Lane,* 489 U.S. 288, 299–300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Ferrara's right to relief is based on rules rooted in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Brady v. United States, supra,* which were long and clearly established in 1992, when Ferrara's conviction became final.

As the parties agree, a retrial is not now feasible. Rather, Ferrara must be resentenced. As the parties also agree, the resentencing is governed by the law that now exists after *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), which rendered the Guidelines advisory. The court finds that the evidence is insufficient to hold Ferrara re-

---

1. As RICO racketeering acts, but not as separate substantive crimes, Ferrara was also accused of participating in the 1977 murder of Giacomo DiFronzo and the 1979 murder of Anthony Corlito. Ferrara did not plead guilty to committing either of these crimes. The government's evidence concerning them was sparse and weak. Its case against Ferrara on these murder charges depended heavily on Jordan's credibility. If it had been disclosed that Jordan had claimed to have committed perjury in testifying to the grand jury that Barone had said Ferrara ordered the Limoli murder, Jordan's already limited credibility would have been destroyed. Therefore, there is a reasonable probability that Ferrara would not have been convicted of the racketeering acts relating to the DiFronzo and Corlito murders or held responsible for them at sentencing. Accordingly, those crimes cannot be relied upon to calculate the advisory Guideline range for Ferrara's sentence and, more specifically, to raise it to life in prison.

sponsible for the Limoli murder, or any other murder, in calculating the advisory Guideline range for his sentence.

Ferrara contends that, absent the murder charges, the Guideline range for his sentence is 151–188 months. The government argues that, without the murders, the Guidelines suggest a sentence of 210–262 months. In view of the reasons for the substantial downward departures agreed to and granted in 1992 for Ferrara and the defendants on trial with him, it seems clear that, at most, a sentence at the low-end of the range as calculated by the government would now be appropriate.

Ferrara has earned all available "good time" credits, which entitle him to a 15% reduction in his sentence. If he had been sentenced to 188 months in prison, he would have been released in July 2003. If he had been sentenced to 210 months in prison, he would have been released in February 2005. In either case, Ferrara has evidently now served extra time in prison because of the government's unconstitutional conduct. Therefore, Ferrara will be resentenced promptly.

## II. FACTS

The following facts have been proven, pursuant to the Federal Rules of Evidence, by a preponderance of the evidence.

On March 22, 1990, Ferrara was indicted on racketeering and related charges with six other alleged members and an alleged associate of the Patriarca Family of La Cosa Nostra. More specifically, Ferrara, Raymond J. Patriarca, Joseph Russo, Robert Carrozza, Dennis Lepore, Carmen Tortora, Pasquale Barone, and Angelo Mercurio, who was, significantly, a fugitive, were charged with violating the RICO statute, 18 U.S.C. § 1961 et seq., by conspiring to participate in the affairs of a racketeering enterprise, and doing so, through a pattern of racketeering acts that included murder, extortion, and other crimes, some of which were also charged as separate substantive offenses.

Ferrara was charged in thirty-five counts. The RICO violations were alleged in Counts 1 and 2. Racketeering Act A–3 alleged that in 1985, "Vincent M. Ferrara and Pasquale Barone did wilfully and unlawfully conspire together with each other and with others known and unknown to the Grand Jury to assault and beat Vincent James Limoli, Jr. a/k/a 'Jimmy,' with intent to murder him. . . ." Count 3 charged Ferrara with conspiring with Barone to murder Limoli for the purpose of maintaining and increasing their positions in the Patriarca Family. Count 4 charged Ferrara with aiding and abetting the murder of Limoli in order to maintain and increase his position in the Patriarca Family.

Proving the Limoli murder charges was very important to the government. If Ferrara, who was about forty years old when he was indicted, was not held responsible for a murder, the Guideline range for his sentence might have been as little as 151 to 188 months.[2] However, if convicted of the charges relating to the Limoli murder, or another murder, the Guideline range for Ferrara's sentence would be raised to life in prison.

In addition, the government wanted to obtain a lengthy sentence for Patriarca, the Boss of the Family. The Guidelines prescribed a sentence of about seven years for his own charged criminal activity. *See United States v. Patriarca,* 807 F.Supp. 165, 178 (D.Mass.1992), *rev. sub nom. United States v. Carrozza,* 4 F.3d 70, 72–

---

**2.** The issues relating to the calculation of the possible Guideline ranges for Ferrara's sen-     tence are discussed in § III.D *infra.*

84 (1st Cir.1993), *cert. denied, Patriarca v. U.S.,* 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994); *United States v. Patriarca,* 912 F.Supp. 596, 599–600 (D.Mass. 1995). However, if the Limoli murder could be proved at sentencing to be a racketeering act committed on behalf of the Family, in furtherance of Patriarca's jointly undertaken activity and reasonably foreseeable to him, the government believed that the Guidelines would require that he receive either a thirty-year sentence or a sixty-five year sentence. *See Patriarca,* 807 F.Supp. at 178; *Patriarca,* 912 F.Supp. at 602.

Ferrara was also charged with Racketeering Acts involving the murder of Giacomo DiFronzo in 1977 (R.A. A–1), and the murder of Anthony Corlito in 1979 (R.A. A–2). Ferrara was not charged in a separate count with substantive crimes concerning those murders. As described *infra,* the government's evidence concerning Ferrara's involvement in them was sparse and weak. Moreover, the government did not contend that the DiFronzo or Corlito murders were relevant conduct for which Patriarca should be held responsible. *See Patriarca,* 807 F.Supp. at 185–86; *Patriarca,* 912 F.Supp. at 600. Therefore, proving that Ferrara conspired with Barone to murder Limoli on behalf of the Patriarca Family was especially important to the government's goal of incapacitating Ferrara and Patriarca for life.[3]

The Limoli murder, however, was not central to the extensive pretrial litigation in Ferrara's case. While many issues were presented, the most consuming related to the defendants' motion to suppress the electronic surveillance evidence of an LCN induction ceremony conducted on October 29, 1987, at 34 Guild Street, Medford, Massachusetts. The defendants claimed that the "roving" intercept provision of the statute ("Title III") authorizing the electronic surveillance, 18 U.S.C. § 2518(11)(a), was unconstitutional and, in any event, that the intercepted evidence should have been suppressed because the government deliberately presented materially misleading information to the judge who issued the warrant for the electronic surveillance. *See United States v. Ferrara,* 771 F.Supp. 1266, 1271 (D.Mass. 1991).

To obtain an order authorizing roving electronic surveillance, which could be used at various locations at which named targets were conversing, the government was required to make a "full and complete statement" to the judge that demonstrated that it was not practical to specify the place or places to be bugged. *See* 18 U.S.C. § 2518(11)(a)(ii); *Ferrara,* 771 F.Supp. at 1307. This court held the roving intercept provisions were constitutional. *See Ferrara,* 771 F.Supp. at 1272, 1282–96.

The roving warrant that was obtained did not specify a particular place to be bugged because the government had represented that it was not practical to describe in advance the place at which Ferrara and other targets would be intercepted. Therefore, it was important for the motion to suppress that the defendants and the court know when the government had identified 34 Guild Street as the likely location of the LCN induction ceremony and, particularly, whether that location had been identified

---

3. In addition, the government attempted in another case to use the Limoli homicide to obtain the pretrial detention of Anthony "Spucky" Spagnolo, who was also a member of the Patriarca Family. This effort was unsuccessful because, the evidence showed, the government was wrong in asserting that Spagnolo participated in killing Limoli. *See United States v. DiGiacomo,* 746 F.Supp. 1176, 1189 (D.Mass.1990); *Patriarca,* 912 F.Supp. at 623.

before the order authorizing the roving electronic surveillance had been issued on October 27, 1989. *Id.* at 1307.

The government did not initially inform the defendants and the court that it had identified the likely location of the ceremony, and therefore the place it intended to surveil electronically, before the roving order was issued. *Id.* at 1271, 1308. In a memorandum signed by the lead prosecutor, Jeffrey Auerhahn, on behalf of Assistant United States Attorneys Gregg Sullivan, James Herbert, and himself, the government argued that it was not required to apply for a standard, rather than roving, "Title III order if, after issuance of a roving order, but before its implementation, the government learns, less than twenty-four hours in advance of the meeting, the intended probable location." *Id.* at 1308 n. 16; Gov. Response to Defendants Patriarca's and Ferrara's Motions to Suppress All Evidence Derived from Oral Intercept Order in M.B.D. 89–1015 and to Dismiss Indictment (Docket No. 404). Only after inquiry by the court did the government reveal that it had actually learned that the induction ceremony would be held at 34 Guild Street two days in advance, on October 27, 1989, before the roving order had been issued in reliance upon the representation that it would be impractical to identify the place to be electronically surveilled. *Id.* at 1271, 1277–79, 1308.

Thus, the court wrote:

The government not only failed to inform Judge Nelson [who issued the order authorizing the roving electronic surveillance] of the information it had received regarding 34 Guild Street prior to his issuance of the Warrant, it also did not initially inform the defendants or this court that it had such information. The government's initial memorandum opposing the motion to suppress addressed the issue whether the court

should have been furnished with information concerning 34 Guild Street acquired *after* the warrant issued, but did not disclose all of the relevant facts in this case. Although the government corrected and completed the record when invited by the court to file affidavits concerning when it first learned of 34 Guild Street as the possible location for the ceremony, the government's initial lack of candor was—and remains—disturbing to this court.

*Id.* at 1308 (emphasis in original) (citation omitted).

As discussed *infra*, as a result of lengthy hearings conducted in 1998, in *Salemme*, this court discovered that the government had not in 1991 completed or fully corrected the record in Ferrara's case. *See Salemme*, 91 F.Supp.2d at 269–89. Rather, as this court wrote in 1999:

At all times prior to October 29, 1989, the FBI, personified by [Supervisory Special Agent James] Ring, knew that there would be at least one informant, Mercurio, at the ceremony. The FBI sought a warrant for a "roving" bug that could be used at multiple, unidentified locations, rather than authorization to conduct electronic surveillance at 34 Guild Street alone, in order to protect the identity of its sources. The FBI had no intention of using that warrant to intercept conversations more than once [as it had represented in its application]. Rather, at the time the application was drafted, the FBI intended to arrest the participants immediately after the ceremony. The FBI had substantial, corroborated "rock solid" information that the ceremony would be held at 34 Guild Street several hours before [the applicants] met with the judge to obtain the warrant authorizing roving surveillance based upon the representation that it

was then "impractical" to identify the location to be bugged.

*Id.* at 270 (footnote omitted).

In addition, after the ceremony, the FBI alerted Mercurio to his forthcoming indictment so that he could flee, and did not attempt to apprehend him. *Id.* at 263–93. Permitting him to flee unlawfully rewarded Mercurio for his assistance to the government, and reduced the risk that it would be discovered that the government had improperly withheld information from the judge who issued the order authorizing the roving electronic surveillance. *Id.*

However, based on the incomplete information presented in Ferrara's case, the court did not suppress the electronic surveillance of the LCN induction ceremony. Rather, the court erroneously found that the government did not deliberately mislead the judge who issued the roving order. *Ferrara*, 771 F.Supp. at 1274, 1306–11. Moreover, the court concluded that an order authorizing interceptions at 34 Guild Street would have been issued if the judge had been fully informed. *Id.*

In 1991, Barone, who was an alleged "associate" of the Patriarca Family, was serving a state sentence for participating in the Limoli murder. Barone fled following that crime. This court ordered the suppression of certain statements made after Barone was apprehended. *See United States v. Barone*, 968 F.2d 1378, 1379 (1st Cir.1992). The government appealed that decision, which was affirmed in 1992. *Id.* However, the court severed the charges against Barone, and initially scheduled the trial of Ferrara and his other codefendants to begin in September 1991.

Walter Jordan, Barone's brother-in-law, was the crucial witness for the government with regard to the Limoli murder charges against Barone, Ferrara and, by implication, Patriarca. With regard to Racketeering Act A–3, the government was required to prove that Ferrara conspired with Barone to murder Limoli. With regard to Counts 3 and 4, the government was required to prove that the purpose of that conspiracy was to maintain or increase Ferrara and Barone's positions in the Patriarca Family. Jordan was the only witness who presented direct evidence that Ferrara conspired with Barone to murder Limoli.

Like Barone, Jordan had fled following the Limoli murder. When captured, Jordan agreed to cooperate with the government in exchange for immunity and protection. On July 27, 1988, Jordan testified to the grand jury that Limoli had been working under Ferrara in the LCN and had "gotten the 'X'" because he had stolen drugs and cash that belonged to another member of the LCN. *See* July 27, 1988 Transcript of Grand Jury Testimony of Walter Jordan, attached as Exhibit A to Petitioner's First Amended Motion Pursuant to 28 U.S.C. § 2255 to Vacate and Set Aside Sentence, at 11–12. Jordan also told the grand jury that Ferrara had "ordered, or told [Barone] that he had to clip [Limoli]." *Id.* at 16; *see also id.* at 15. Jordan stated that he helped arrange a purported drug deal with Limoli, after which Barone shot Limoli in the head. *Id.* at 17–33. Jordan informed the government that Barone had said that Ferrara ordered him to kill Limoli. As the court stated at Barone's trial, "Walter Jordan's credibility [was] essential" to proving that Barone killed Limoli at Ferrara's direction. *United States v. Barone*, 89–00289–MLW, Oct. 18, 1993 Tr. at 50–51 ("Barone Tr. ___").[4]

---

**4.** Cited Transcripts from proceedings in *United States v. Ferrara*, Cr. No. 89–289–MLW, and from the proceedings concerning Ferrara's § 2255 petition are identified only by date.

Jordan was in the Witness Security Program. To prepare for the trial of Ferrara and his codefendants, Auerhahn, Sullivan, FBI Special Agent Michael Buckley, and Boston Police Detective Martin Coleman, who was serving as a member of the federal Organized Crime Task Force, met with Jordan in Salt Lake City, Utah, in July 1991. Coleman was the member of the prosecution team who was closest to Jordan.

On their last evening in Salt Lake City, Jordan told Coleman that Barone had not obtained Ferrara's permission to murder Limoli and had never said that Ferrara had ordered that Limoli be killed. Coleman knew that this recantation was very important.

When he returned to Boston, Coleman told Auerhahn about his conversation with Jordan. Auerhahn and Coleman then had a telephone conversation with Jordan, who reiterated what he had told Coleman in Salt Lake City.

Coleman told his partner, Boston Police Detective William Dickinson, what Jordan had said. Neither Coleman nor Auerhahn told Sullivan.

Coleman rarely wrote memoranda. However, he recognized that Jordan's recantation was extraordinary and important. Therefore, he promptly prepared a handwritten memorandum to the file, which was, on September 5, 2003, admitted as Exhibit 17 in the evidentiary hearings on Ferrara and Barone's petitions for habeas corpus.[5] The memorandum stated:

To: file

From DET. MARTIN E. COLEMAN

SUBJECT LIMOLI MURDER

ON WEDNESDAY, JULY 24, 1991 AT ABOUT 11:30 P.M. MT [Mountain Time], WHILE HAVING A CONVERSATION WITH TONY JORDAN, A GOVERNMENT WITNESS, MR. JORDAN STATED TO ME THAT PATTY'S[6] BARONE HAD FUCKED UP AND DID NOT GET PERMISSION TO KILL JIMMY LIMOLI.

ON THURSDAY, JULY 25, 1991, WE TRAVELED BACK TO BOSTON, AND I TOLD AUSA MR. AUERHAHN THAT I HAD TO SEE HIM ON FRIDAY ABOUT TONY JORDAN. ON FRIDAY, JULY 26, 1991, I TALKED TO AUSA AUERHAHN AND TOLD HIM WHAT MR. JORDAN HAD SAID TO ME.

ON MONDAY, JULY 29, 1991 AT ABOUT 10:30 AM, MR. JORDAN RETURNED A CALL TO MR. AUERHAHN'S OFFICE, AND I ASK HIM TO REPEAT TO AUSA AUERHAHN WHAT HE HAD SAID TO ME ON JULY 24.

AT THIS TIME, MR. JORDAN STATED THAT HE KNEW THAT PATTSIE BARONE HAD NOT GOTTEN PERMISSION TO KILL JIMMY LIMOLI. HE FOUND THIS OUT AFTER JIMMY'S WAKE PATTY'S AND HE GOT INTO A CAR WITH VINNY FERRARA AND A JOE THE JEWELER.

VINNY SAID TO PATTY'S "WHO'S NEXT ME."

JORDAN FURTHER STATED THAT SOME TIME LATER THAT WEEK THAT PATTY'S GOT CALLED OVER TO FRANCHESCO'S[7] AND VINNY

---

5. Because Coleman did not recall everything that was said in the telephone conversation that occurred about twelve years before his testimony, the memorandum was admitted as past recollection recorded pursuant to Federal Rule of Evidence 803(5).

6. Barone was generally known as "Patsy."

7. Franchesca's was a restaurant in the North End of Boston, near Barone's home.

TOLD HIM HE WAS DEAD. AT·THIS TIME PATTY'S RAN OUT OF FRANCHESCO'S A REST. ON N. WASH ST. AND OVER TO HIS APARTMENT WERE JORDAN WAS AND TOLD JORDAN THAT THEY HAD TO GET OUT OF TOWN BECAUSE VINNY WAS GOING TO KILL THEM. JORDAN THEN SAID WHY IS HE GOING TO KILL U.S. AND PATTY'S SAID BECAUSE I DID NOT GET PERMISSION TO KILL JIMMY.

Coleman gave a copy of this memorandum to Auerhahn. Auerhahn recognized that Coleman's memorandum memorialized exculpatory information that was very damaging to the government's case. The prosecutor asked Coleman if he, Auerhahn, could "clean it up." September 24, 2003 Tr. at 19. Coleman thought that Auerhahn merely wanted to correct the spelling and grammar, so he did not object. *Id.* at 25.

As a result of the telephone conversation, Auerhahn arranged another meeting with Jordan. That meeting was held in Minneapolis, Minnesota, in August 1991. Auerhahn did not bring Sullivan to the meeting. However, Buckley and Coleman were there.

As the meeting involved further trial preparation, Auerhahn knew that, pursuant to standard operating procedure, Buckley would not take any notes or prepare an FBI report, known as a "302." Auerhahn also correctly expected that Coleman would not take any notes or write a report.

It had been Auerhahn's consistent practice to take detailed notes when he was preparing a witness for trial. He departed from that standard practice and took no notes, other than possibly writing on his pre-existing trial outline, during the Minneapolis meeting. Auerhahn did not want to create a record of the changes in Jordan's testimony.

In Minneapolis, Jordan began to recant his grand jury testimony that Ferrara instructed Barone to kill Limoli. Buckley became upset, and Jordan was sent to the hallway. Coleman was soon sent to speak with Jordan and "straighten him out." Sept. 4, 2003 Tr. at 28–9, 86, 107, 180–81.

Jordan then had a well-founded· fear of losing the protection of the government. At that time he was in the Witness Security Program because there was a legitimate concern that he would be murdered if he were not protected. Jordan was also concerned about losing his immunity. He had told the prosecutors about his participation in the Limoli homicide. His cooperation agreement with the government required that he be truthful. If the government decided he was not being truthful, it could use his statements to prosecute him for the Limoli murder. After his discussion with Coleman, Jordan returned to the hotel room. He was repeatedly urged to give a story that would conform to his prior testimony and statements, and Jordan reversed his recantation.

After the Minneapolis hearing, Auerhahn prepared a typed memorandum that was purportedly written by Coleman. It stated:

TO: FILE
FROM: MARTIN F. COLEMAN
    BOSTON POLICE DEPARTMENT
    SPEC. DEPUTY U.S. MARSHAL
RE: STATEMENTS OF WALTER A. JORDAN
DATE: SEPTEMBER 4, 1991
On July 24, 1991, I concluded several days of debriefing of Walter Jordan with Assistant U.S. Attorneys Jeffrey Auerhahn and Gregg Sullivan and Special Agent Michael J. Buckley of the FBI at a neutral and secure location outside the Boston area. At approximately 11:30 p.m. on that date, Jordan told me that some things he told us during the debriefing were not true. He told me that

at one point Barone told him that the Limoli homicide was not ordered by Vincent Ferrara. He further told me that when Barone returned from Franchesca's the night before they fled the Boston area, Barone told him that they had to leave right away because Ferrara would kill them because Barone had "fucked up".

On Thursday, July 25, 1991, we returned to the Boston area and I told Attorney Auerhahn that I needed to talk with him concerning Walter Jordan. On Friday, July 26, I told AUSA Auerhahn of my conversation with Mr. Jordan.

On Monday, July 29, 1991, Mr. Jordan, pursuant to a request that was transmitted to him through the Marshals Service, called AUSA Auerhahn and myself. Jordan repeated what he had told me the previous Wednesday night. Jordan was informed that we would make arrangements to meet with him again to discuss the facts surrounding the Limoli homicide and his conversations with Barone both before and after the murder.

On Tuesday, August 27 and Wednesday, August 28, 1991, AUSA Auerhahn and SA Buckley and I met with Walter Jordan at a neutral and secure location outside the Boston area. The relevant statements made by Jordan during these meetings will be memorialized in a 302 report by SA Buckley.

Exhibit 16 (Sept. 5, 2003).[8]

Auerhahn testified that he did not recall ever seeing this document. *See* Sept. 5, 2003 Tr. at 185. The court is persuaded, however, that Auerhahn not only saw the document, he prepared it.[9]

This memorandum was Auerhahn's effort to "clean up" Coleman's handwritten memorandum—to "sanitize" it to be less damaging to the government than Coleman's handwritten memorandum if it were produced to the defendants. It was intended to tone down what Coleman had written in Exhibit 17 and to explain why Coleman was not making a record of what was said in Minneapolis. The memorandum states that Buckley was going to prepare a 302 report. This was false and was known by Auerhahn to be false. As each witness in the evidentiary hearings testified, it was well known that if an attorney was conducting a trial preparation session, an FBI agent would never take notes or prepare a 302.

If it had been disclosed, the typewritten memorandum would not have been nearly as harmful to the government's case as the handwritten memorandum, which is much more specific and directly refutes the

---

**8.** Exhibit 16 was not admitted for the truth of the information it included and, therefore, was not hearsay. *See* Fed. R. Ev. 801(c).

**9.** Coleman did not write or type Exhibit 16, even though it states that it is a memorandum from him. It does not sound as if it was written by the same person who wrote the handwritten memorandum, Exhibit 17. Rather, it is written in an entirely different style and employs distinct diction, using such phrases as "neutral and secure location" and "will be memorialized." Moreover, Coleman credibly testified that if he had written Exhibit 16, he would have signed it after it was typed. *See* Sept. 5, 2003 Tr. at 275.

Coleman did not have a word processor or typewriter. Kathleen Reilly, who generally typed any memoranda Coleman wrote, did not write the memorandum, nor did she type it from any handwritten document given to her by Coleman. The format of this memorandum does not match the format that she invariably used when typing memoranda.

Contrary to a suggestion by the government, Dickinson did not write this memorandum. Sullivan could not have written this memorandum because he was not informed of the changes in Jordan's testimony, or included in the Minneapolis meeting.

Thus, the credible evidence convinces the court that Auerhahn wrote and typed Exhibit 16.

charges that Ferrara ordered Barone to murder Limoli. However, neither the typed nor handwritten memorandum, nor the information that they contained, was disclosed to Ferrara, Barone, or their co-defendants in connection with their trials or sentencings. Rather, they were only disclosed after Coleman testified in the hearings in this § 2255 case on September 5, 2003.

The failure of the government to disclose the information contained in the two documents, particularly the accurate and complete information in the handwritten memorandum prepared by Coleman, violated the government's duty to Ferrara and, as described *infra*, deprived him of Due Process. The Local Rules of the United States District Court for the District of Massachusetts provided for automatic discovery. Although slightly revised in 1990, they at all times relevant to Ferrara's case required that the government produce automatically, within fourteen days of arraignment, "all exculpatory evidence within the meaning of *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)." Local Rule 42(a)(5) (1986 version); Local Rule 116.1(A)(5) (1990 version). In 1963, *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. 1194, clearly established that the government has a duty to disclose to a defendant exculpatory evidence that is material to guilt or punishment. Coleman's memorandum contained such information.

In addition, the Local Rules explicitly provided that, "[a]ny duty of disclosure and discovery set forth herein is continuing." Local Rule 42(c) (1986 version); Local Rule 116.1(C) (1990 version). This continuing duty required the government to supplement its disclosures if, among other things, it obtained after its initial disclosures material information tending to negate guilt.

As discussed *infra*, the government acknowledges that if, as the court finds, Jordan's recantation is material evidence that directly negates guilt on certain charges, the government was constitutionally required to disclose it to him before trial. *See* Apr. 1, 2004 Tr. at 53–4. *Cf.* footnote 11, *infra*.

The trial of Ferrara and his codefendants was rescheduled to begin in January 1992. Prior to that trial, Patriarca pled guilty without any agreement with the government.

On October 16, 1991, as ordered in response to defendants' motion for a bill of particulars, the government filed a 254–page Trial Brief that was signed by Auerhahn. The Trial Brief identified Jordan as a cooperating witness and described his anticipated testimony concerning the Limoli murder. *See* Trial Brief of the United States (Docket No. 683) (hereinafter "Trial Brief") at 207–11. Among other things, the government stated that Jordan would "testify to Barone's statement that Limoli was killed on the orders of Vincent Ferrara." *Id.* at 208. The government did not in the Trial Brief, or in any other way, disclose that Jordan had recanted this contention before reverting to his earlier version of events.[10]

---

**10.** In September 2003, Auerhahn testified that he did not recall Jordan ever telling him that, upon returning from Franchesca's, Barone said that Ferrara was going to kill them because he, Barone, did not get Ferrara's permission to murder Limoli. *See* Sept. 5, 2003 Tr. at 162, 164. As described earlier, Auerhahn also testified that he did not recall seeing the typed memorandum, Exhibit 16. *See* Sept. 5, 2003 Tr. at 185. A witness who falsely testifies that he does not recall a material fact has committed perjury. *See United States v. Collatos*, 798 F.2d 18, 19 (1st Cir. 1986).

The Trial Brief made it clear that the government's case concerning the Limoli murder depended heavily, if not exclusively, on Jordan's testimony. He was the only witness concerning Limoli identified in the Trial Brief. Pretrial discovery revealed that there was no electronic surveillance implicating Ferrara in the Limoli murder. Nor was there any scientific evidence that would be used against him.

It would have been evident to competent counsel that Limoli's sister, Elizabeth DiNunzio, was on the witness list to testify about his murder. It would also have been clear, however, that she was not likely to have any personal knowledge of the events at issue, and that getting statements of Limoli admitted through her would be a challenging task. As discussed *infra*, the accuracy of such an assessment of the evidence concerning the Limoli murder was demonstrated at Barone's trial.

The Trial Brief also indicated that the government had little evidence to prove that Ferrara had participated in the murders of DiFronzo or Corlito. *Id.* at 211–14. DiFronzo was murdered in 1977 and Corlito was killed in 1979. No one had ever been prosecuted, let alone convicted, for those crimes. Each was charged only as a racketeering act, rather than as a substantive offense. No witness to either murder was mentioned in the Trial Brief. Nor was there any scientific or electronic surveillance evidence concerning those crimes.

Therefore, the Trial Brief would have indicated to competent counsel that Jordan was the key witness concerning the DiFronzo and Corlito killings, as well as the Limoli murder. It would also have been evident that Jordan's credibility would be critical to the government's effort to prove all of the murder charges at any trial or sentencing, and that any information that tended to negate Ferrara's guilt and/or impeach Jordan's credibility was important to Ferrara.

In January 1992, the trial of Ferrara and his codefendants, except for Patriarca and Barone, began. *See Carrozza*, 807 F.Supp. at 157. After the impanelment of a jury, on January 22, 1992, all five of the defendants entered into linked, binding plea agreements with the government.

The plea agreements provided, among other things, that each defendant would: (1) remain silent with regard to the factual basis for his plea and, particularly, not say anything with regard to the existence of, or his membership in, the LCN; (2) plead guilty to all, or virtually all, of the charges against him; (3) be required to serve a substantial term of incarceration; (4) be placed on Supervised Release for three to five years after serving his sentence; and (5) except for Tortora, forfeit a substantial

---

Regardless of whether in 2003 Auerhahn recalled Jordan's recantation, he recognized that it was directly inconsistent with the charges in the Superceding Indictment which in effect alleged that Ferrara had ordered Barone to kill Limoli. *See* Sept. 5, 2003 Tr. at 164. He testified that he also knew that this information had to be disclosed to the defendants "at some point." *Id.* at 163. The court finds that Auerhahn was, in late 1991 and 1992, well-aware of Jordan's important recantation and intentionally did not disclose it to Ferrara. In addition, the court finds that Auerhahn would not have disclosed this infor-

mation to Ferrara even if his case had been tried to a verdict, in part because Auerhahn did not disclose it to Barone before or during his eleven-week trial in 1993, or in connection with Barone's sentencing.

For the purposes of determining whether Ferrara has been denied Due Process, however, it does not matter whether the government's failure to produce the material exculpatory evidence was deliberate or inadvertent. *See Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. 1194; *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

sum of money. Some of the plea agreements provided for sentences constituting a downward departure from the otherwise applicable Sentencing Guidelines. Each plea agreement was contingent upon acceptance by the court of all four of the other agreements, reflecting the government's view that eliminating the need for any trial was a major purpose and benefit of each agreement.

*Id.* (footnote omitted).

Four of the five agreements provided for what were understood to be significant downward departures. More specifically, they provided for downward departures from life (for the murder of Barboza) to sixteen years for Russo; from up to 293 months to 228 months for Carrozza; from more than seventeen years to thirteen years for Tortora; and from life to twenty-two years for Ferrara. *Id.* at 158–59.

Just before the court began the plea colloquy, Russo insisted on making a public statement that he was not acknowledging the existence of the LCN. To secure the global pleas, the government promptly renegotiated its agreement with Russo and permitted him to make that statement in return for his agreeing to serve an additional year in prison. *Id.* at 157 n. 2; *Patriarca,* 807 F.Supp. at 178.

Ferrara's trial counsel, Oscar Goodman, Esq., now states that Ferrara at all times told him that he had not ordered the Limoli murder. *See* Ferrara's Post Hearing Memorandum in Support of Amended Motion to Vacate Judgment (Docket No. 103), Appendix B, Declaration of Oscar Goodman, ¶ 10. If Ferrara were not held responsible for the Limoli, Corlito, or DiFronzo murders, his lawyers assert that the Guideline range for his sentence would have been 151–188 months (or about twelve to sixteen years) in prison. ·*See* Ferrara's Post Hearing Memoranda in Support of Amended Motion to Vacate

Judgment (Docket No. 103) at 10 and Appendix A; Apr. 1, 2004 Tr. at 58, 91–92, 97.

Nevertheless, Ferrara agreed to plead guilty to the RICO charges, the racketeering acts involving the Limoli murder, and the related substantive charges in Counts 3 and 4, among others. *Id.* at 158; Jan. 22, 1992 Tr. at 61–2. He did not, however, agree to plead guilty to the racketeering acts concerning the DiFronzo and Corlito killings. *See* Jan. 22, 1992 Tr. at 61–2. Ferrara's guilty plea on the Limoli murder charges generated a Guideline sentence of life imprisonment absent a downward departure. *See Carrozza,* 807 F.Supp. at 158–159. Thus, the alleged racketeering acts concerning the DiFronzo and Corlito murders were not material to calculating the Guideline range for Ferrara's sentence. The parties agreed to what was described as a significant downward departure to a sentence of twenty-two years in prison for Ferrara. *Id.* This was, however, a sentence of six to ten years longer than the sentence Ferrara's counsel believed the Guidelines would prescribe if he were not held responsible for the Limoli murder and received credit for acceptance of responsibility.

Although he in effect pled guilty to ordering Barone to kill Limoli, Ferrara promptly asserted his actual innocence by informing the Probation Department that he had not done so. He also did not admit to participating in the Corlito or DiFronzo murders. Rather, Ferrara's Presentence Report stated, in pertinent part, that:

*Acceptance of Responsibility*

(3) To most of the acts charged in the counts in which he is named in the indictment, the defendant takes little exception in terms of accepting responsibility.

(4) He does however take issue with the allegation that he is ultimately responsible for the murders of the three individ-

uals named in Racketeering Acts A–1(a)(b); A–2(a)(b); A–3(a)(b). To preserve his position on these matters, the defendant insists that the following be incorporated into the report and that the distinctions therein are made with certainty:

James DiFonzo [sic] and Anthony Corlito were "despicable human beings. They were heroin addicts, killers, and James DiFonzo [sic] was a rapist." They were in short "low lifes." Without conceding any responsibility for their deaths, the defendant "does not care, if people think that (he) did it."

(5) *His admission (in terms of a guilty plea) to having contracted for the death of James Limoli, is particularly troubling to the defendant. In fact, prior to entering the plea, he spoke with the decedent's father, and explained the untenable position he was in and why he found it necessary to acknowledge his involvement in James Limoli['s] death, even though he disavows any planning or participation in the killing.*

Presentence Report at 105–106 (emphasis added).

The court now realizes that Ferrara was asserting that he was in the "untenable position" of having to risk a jury verdict based on false testimony by Jordan that could result in a sentence of life in prison or plead guilty to a crime that Ferrara was claiming that he did not commit, and accept a twenty-two year sentence, in order to avert that risk. Ferrara also offered the Probation Department "an historical account" of his association with Limoli. Presentence Report at 106. Among other things, Ferrara stated that he "disclaims any complicity in this murder; it was a spontaneous act the culmination of an argument between Limoli and Barone." *Id.* at 107. Nevertheless, Ferrara did not object to the recommendation in the Presentence Report that the Guideline range for

his sentence be calculated as if he were responsible for the Limoli murder. *See* Addendum to Presentence Report.

Ferrara, Russo, Carrozza, Lepore, and Tortora were sentenced on April 29, 1992. The issue of Ferrara's responsibility for the Limoli homicide was not discussed at the sentencing hearing. *See* Apr. 29, 1992 Tr. at 1–69. The court did not focus on this issue.

The court did note that a benefit of the pleas to the government was the fact that they eliminated the risk that guilty individuals might be acquitted. *Id.* at 40. Referencing particularly Russo's acceptance of responsibility for the Barboza murder, the court stated that it was "fully satisfied there was a proper basis for the guilty pleas, and ... satisfied that the defendants are guilty of the offenses they pled to." *Id.* The court would not have made this statement with regard to Ferrara's responsibility for the Limoli murder if the government had disclosed Jordan's statements that Barone had told him that he had *not* received permission from Ferrara to murder Limoli. The court now seriously doubts that Ferrara ordered the Limoli murder. The court also has no confidence that, if Jordan's recantation had been disclosed, Ferrara would have attempted to plead guilty to the Limoli charges or that the court would have accepted such a plea. Moreover, the court is persuaded that the government would not have been able to prove fairly Ferrara's involvement in Limoli's murder even by a preponderance of the evidence.

However, in 1992, the court accepted the binding, global plea agreements. *Id.* at 35–43; *Carrozza,* 807 F.Supp. at 159–65. The court found that significant downward departures for Ferrara and other defendants were justified and reasonable in part because they assured convictions and substantial sentences, protected the confidentiality of fearful witnesses, and allowed

limited prosecutorial and judicial resources to be devoted to other important matters. *See Carrozza,* 807 F.Supp. at 159–61.

Patriarca was sentenced on June 16, 1992. The government sought to have him held responsible for the Limoli murder as relevant conduct. *See Patriarca,* 807 F.Supp. at 178. The government initially argued that if the Limoli homicide was relevant conduct of Patriarca, the Guideline range for his sentence would be raised from about seven years to thirty years in prison. *Id.* The government's theory was that: Ferrara had ordered Barone to kill Limoli; an LCN murder could not be committed without the approval of the Boss; and, therefore, Patriarca authorized the Limoli murder. *Id.* at 201. Thus, the government's theory required that it prove that Ferrara ordered Barone to kill Limoli.

As indicated earlier, in 1992 it had been long and clearly established that the gov-ernment must disclose exculpatory evidence that is material to punishment as well as guilt. *See Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. 1194. However, the government, led by Auerhahn, did not disclose to Patriarca the highly material Coleman handwritten memorandum, Auerhahn's own sanitized version of it, or the information that they contained in connection with his initial sentencing in 1992.[11] This important information was also not revealed by Auerhahn in connection with the 1995 hearings relating to the resentencing of Patriarca in which the government unsuccessfully contended that the court was required to sentence Patriarca to sixty-five years in prison because the Limoli murder constituted relevant conduct for which he was responsible. *See Patriarca,* 912 F.Supp. at 602.

In 1993, the court conducted an eleven week trial of the charges against Barone.

---

**11.** In anticipation of Patriarca's original sentencing, on May 8, 1992, Auerhahn did write to Patriarca's counsel that:

> On several occasions prior to the murder of Vincent James Limoli, Jr., Pasquale G. Barone explained, in some detail, to Walter A. Jordan, or to another in Jordan's presence, the motive for the Limoli homicide. Shortly after the murder, Jordan fled Boston at the direction of Barone. (Barone fled as well.) Some time later, Jordan learned the reason why he and Barone were forced to flee. Jordan learned that Barone was supposed to use Jordan to set up Limoli and then kill Limoli and Jordan on the night of October 28, 1985. For failing to follow the order from Vincent M. Ferrara, and for sparing the life of his brother-in-law, Barone had incurred the wrath of Ferrara and proven to be unreliable. Therefore, both Barone and Jordan were in jeopardy if they remained in Boston. On one occasion, however, Barone provided a different reason which compelled Barone and Jordan's flight from Boston. Prior to learning that he too was to be killed, Jordan was told by Barone that they had to leave Boston because Barone did not get permission to kill

Limoli. When Jordan pressed Barone on this, Barone immediately retracted the statement, and reiterated that the murder was at Ferrara's direction. Thereafter, Barone never again stated that the murder was anything but a sanctioned hit.

Ex. 14 (Sept. 5, 2003), May 8, 1992 letter from Assistant U.S. Attorney Jeffrey Auerhahn to Martin Weinberg, Esq.

This statement to Patriarca's counsel was false and misleading in many respects. It refers to a statement that Jordan made to the government in North or South Carolina, not to the statements Jordan made to Coleman in Salt Lake City or by telephone to Auerhahn and Coleman following the Salt Lake City meeting. The conversation in North or South Carolina preceded the meeting in Salt Lake City and the telephone conversation. Auerhahn's notes do not reflect that Jordan said in North or South Carolina that Barone retracted his statement that they had to leave Boston because he had not received Ferrara's permission to kill Limoli.

In any event, even the false and misleading information provided to Patriarca in the May 8, 1992 letter was not disclosed to Ferrara, who was sentenced on April 29, 1992.

Once again, neither Coleman's memorandum regarding Jordan's recantation, Auerhahn's sanitized version of it, nor the highly material information that they contained was disclosed to Barone.

The government fully understood that it would be both essential and challenging for it to prove that Ferrara ordered Barone to kill Limoli. As Auerhahn stated at Barone's trial: "[O]ne of the potential defenses in this case is that ... maybe Patsy Barone killed Limoli, but not for Ferrara. So, it's very important to establish that Barone did commit murder for Ferrara." Sept. 7, 1993 Barone Tr. at 665. It was equally obvious to the government that it was vital to its case that the jury find Jordan to be a credible witness.

During the trial, it was discovered that Auerhahn had repeatedly improperly failed to disclose exculpatory evidence to Barone. Seven or eight of the discovery violations concerned the failure to disclose exculpatory information relating to Jordan's testimony. See Oct. 18, 1993 Barone Tr. at 35–6. Auerhahn was responsible for each of them. Id. at 48–9. The court informed the jury of the discovery violations that had been discerned. See Oct. 18, 1993 Barone Tr. at 51.

In addition, the court explained to the prosecutors, who were strenuously resisting an *in camera* review by the court of their notes, why exculpatory information might be discoverable even if it were not in an agent's report. See Sept. 28, 1993 Tr. at 133. More specifically, the court stated to Auerhahn:

> if Jordan had said to you on this [hypothetical] walk in the woods ... I've made up half of what I told Mike Buckley because I don't want to get prosecuted for the Limoli murder, that would be

exculpatory even though it was in your notes and not in Buckley's notes.

Id. However, even this description of his duty to produce exculpatory information did not prompt Auerhahn to disclose Jordan's recantation, Coleman's handwritten memorandum, or Auerhahn's sanitized version of it.

The testimony at Barone's trial disclosed that there had been a trial preparation meeting with Jordan in Salt Lake City. Jordan's subsequent telephone call with Coleman and Auerhahn and the Minneapolis meeting were not divulged. Nevertheless, the court ordered Auerhahn and Sullivan to review their notes and was later told that they did not contain any exculpatory information. See, Sept. 30, 1993 Barone Tr. at 3–4.

Despite the fact that the government had improperly withheld Jordan's statements that Barone had said that he did not get Ferrara's permission to murder Limoli, Jordan was vigorously cross-examined for at least five days. See Oct. 18, 1993 Barone Tr. at 51.[12] The court repeatedly characterized Jordan's credibility as "important" and, indeed, as "essential" to the government's case. See, e.g., Oct. 18, 1993 Barone Tr. at 35–6, 50–1.

As the end of the trial approached, the government recognized that its evidence concerning the Limoli murder was weak. Thus, it for the first time argued that the charges did not require that it prove that Ferrara ordered the Limoli murder in order to convict Barone. See Oct. 19, 1993 Barone Tr. at 2–6. The court rejected this contention. Id.

The court also denied Barone's motion to acquit concerning the Corlito murder and another charge relating to the robbery

---

**12.** After concluding his trial testimony, Jordan told another individual that he had lied and blamed the government for coercing him to do so. See August 12, 2003 Order (Under Seal) (Docket No. 60).

of a credit union. This court rarely grants such motions. However, it found the evidence concerning the Corlito murder to be barely sufficient to survive even under the very deferential Rule 29 standard, which required the court to assume that the jury would believe Jordan's testimony. *See, e.g., United States v. Serrano,* 870 F.2d 1, 5 (1st Cir.1989). As the court stated:

> The motion to acquit is genuinely competitive on both the Corlito murder and the credit union robbery. I have to look at the evidence in the light most favorable to the government and, basically, Walter Jordan, if believed, says things which I believe are sufficient for those two predicate acts to remain in the case; that is, taking that as a part of all the evidence, if the jury believed it, the jury could find beyond a reasonable doubt that the events occurred and had a sufficient nexus with the alleged RICO enterprise.

Oct. 7, 1993 Barone Tr. at 6–7.

The jury had great difficulty in deciding the Barone case. The court received a question from the jury on the Limoli murder charges. The jury twice reported that it was deadlocked. The court gave two modified *"Allen* charges," urging the jury to resume its deliberations. The jury ultimately convicted Barone of the RICO charges and of conspiring with Ferrara to murder Limoli. It did not, however, return a verdict on the charge that Barone actually killed Limoli, indicating that the jury did not fully believe Jordan's testimony. All of Jordan's testimony would have been substantially undermined if his recantation had been divulged.

On appeal the First Circuit found that this court improperly admitted some of DiNunzio's testimony, but that the errors were harmless in part because Jordan had said the same things. *See United States v. Barone,* 114 F.3d 1284, 1299 (1st Cir.1997). Barone's conviction was affirmed. *Id.* at

1309. Thus, Barone was required to serve the sentence of life in prison that had been imposed.

As described earlier, in 1989 Mercurio was the informant who told the government that the LCN induction ceremony was planned for October 29, 1989, at 34 Guild Street, before the government filed its application for a roving order by representing that it was impractical to identify the place to be bugged. The FBI later alerted Mercurio to his forthcoming indictment in order to prompt and permit him to flee, and did not attempt to apprehend him.

However, in 1994, Mercurio was arrested in Georgia and sentenced there on state drug charges. In 1995, after Mercurio was returned to Boston, Auerhahn, who represented the government in Mercurio's case:

> informed Magistrate Judge Lawrence Cohen, who was handling pretrial discovery matters, that Mercurio had served as an FBI informant and requested authority to disclose certain statements previously made by Mercurio to him directly, rather than through his lawyers. *Salemme,* 978 F.Supp. at 357 n. 9. The magistrate judge granted the request, and impounded the motion and Order. *Id.* Neither the magistrate judge nor the government informed this court, to which Mercurio's case was assigned, of these matters or of Mercurio's status as an informant. *Id.*

＊　　＊　　＊　　＊　　＊　　＊

When Mercurio fled in 1989, he believed that if he were ever apprehended, he would be dealt with more leniently than if he had been arrested with his codefendants. Mercurio Aug. 5, 1998 [*United States v. Salemme* ] Tr. at 137–38. Mercurio was correct. Russo, Ferrara, Carrozza, Lepore, and Tortora received sentences of between thirteen and twenty-

two years in prison. *Carrozza,* 807 F.Supp. at 158–59. The government [represented by Auerhahn], however, entered into a binding plea agreement with Mercurio, pursuant to Fed. R.Crim.P. 11(e)(1)(C), and persuaded the court to depart downward and impose the agreed-upon 110–month sentence, which in accordance with the government's plea agreement was to be served concurrently with Mercurio's Georgia sentence. *Salemme,* 978 F.Supp. at 357. Thus, in 1996, Mercurio received little, if any, punishment for his federal offenses, while his role as an informant, and its implications for the legality of the bugging of 34 Guild Street, remained masked from this court.

*Salemme,* 91 F.Supp.2d at 293.

Mercurio's status as an FBI informant was eventually revealed in the course of the prosecution of Frank Salemme, Stephen Flemmi and others. In that case, this court ordered the government to disclose whether James "Whitey" Bulger, Flemmi, and Mercurio were informants because their status was relevant to pending motions to suppress electronic surveillance evidence, including the evidence of the October 29, 1989 LCN induction ceremony. *See Salemme,* 978 F.Supp. at 347–58; *Salemme,* 91 F.Supp.2d at 309–10. The Acting Deputy Attorney General refused to obey that order with regard to Mercurio. Mercurio, however, testified that he was cooperating with the government in connection with the LCN induction ceremony. *See Salemme,* 978 F.Supp. at 381; *Salemme,* 91 F.Supp.2d at 310.

In 1998, this court conducted lengthy evidentiary hearings regarding the motion to suppress the evidence of the LCN induction ceremony intercepted at 34 Guild Street, among other things. In those proceedings, the court discovered that important information had not been disclosed to

the judge who issued the roving order or in connection with the 1991 hearings on the motion to suppress that evidence in Ferrara's case. For example, in *Salemme,* the government belatedly produced an October 25, 1989 FBI memorandum, which stated that the roving order was being sought in part because, "[s]uch authorization will [ ] help to protect the identity of any confidential sources, who otherwise might be revealed if singular information (in this case, the location of a sensitive LCN meeting) provided by the source was incorporated into the affidavit of a traditional Title III application." *Salemme,* 91 F.Supp.2d at 282.

This memorandum makes explicit that, contrary to this court's finding in *Ferrara,* 771 F.Supp. at 1279, one motive, if not the sole motive, for seeking authorization for a roving bug was a determination not to risk revealing the FBI's sources of information concerning the induction ceremony. Although this memorandum was maintained in the files of the FBI's Boston Office, it was not produced during the *Ferrara* litigation. Nor was it produced in this case [*Salemme* ] until after the court issued its May 22, 1997 decision granting defendants' motion for an evidentiary hearing on the motion to suppress the electronic surveillance of 34 Guild Street, and noted its prior finding that the failure of the government to make the full and complete statement required by § 2518(11)(a) "was not motivated by the desire to protect the identity of any informant." *Salemme,* 978 F.Supp. at 356 (citing *Ferrara,* 771 F.Supp. at 1279). Rather, the government produced the October 25, 1989 Walthers memorandum on June 3, 1997 and acknowledged that it should have been disclosed in 1991, in the *Ferrara* litiga-

tion. June 3, 1997 [Salemme] Tr. at 10; June 19, 1997 [Salemme] Order at 8 n.4. *Id.*

Because of the more accurate and complete information developed in the *Salemme* hearings, the court's findings of fact differed significantly from those found in Ferrara's case. As described earlier, among other things, the court found in *Salemme* that:

At all times prior to October 29, 1989, the FBI, personified by Ring, knew that there would be at least one informant, Mercurio, at the ceremony. The FBI sought a warrant for a roving bug that could be used at multiple, unidentified locations, rather than authorization to conduct electronic surveillance at 34 Guild Street alone, in order to protect the identity of its sources. The FBI had no intention of using that warrant to intercept conversations more than once. Rather, at the time the application was drafted the FBI intended to arrest the participants immediately after the ceremony. The FBI had substantial, corroborated "rock solid" information that the ceremony would be held at 34 Guild Street several hours before [the applicants] met with the judge to obtain the warrant authorizing roving surveillance based upon the representation that it was then "impractical" to identify the location to be bugged.

*Id.* at 270 (footnote omitted).

However, the court also found in *Salemme* that defendant Robert DeLuca lacked the Fourth Amendment interest in 34 Guild Street necessary to give him "standing" to move to suppress the evidence of the LCN induction ceremony in view of the then recent decision of the Supreme Court in *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). *Id.* at 270 n. 50; 384–400.

The 661–page *Salemme* decision that included the foregoing findings of fact concerning the interception of the LCN induction ceremony was issued on September 15, 1999. On June 29, 2000, Ferrara filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody. He contended that facts that emerged from the proceedings in *Salemme* provided a basis for him to withdraw his guilty plea or, alternatively, for the court to reduce his sentence.

More specifically, Ferrara argued that the facts revealed in *Salemme* prove that the government's application and affidavits in support of the electronic surveillance in his case contained intentional false statements and material omissions which, if they had been corrected and included, would likely have negated any showing of probable cause and necessity for the electronic surveillance generally, as well as any showing of necessity for the roving order used to bug 34 Guild Street. Had he and the court in 1991 been aware of the facts found in *Salemme,* Ferrara contended, there is a reasonable probability that the motions to suppress electronic surveillance evidence would have been granted and, as a result, many of the charges against him would have been dismissed by the government for lack of evidence. Ferrara also asserted that he would not have pled guilty if proper disclosure had been made or would have obtained a more favorable plea agreement. Ferrara also claimed that even if no evidence had been suppressed and no charges dismissed, if he had known of the government's misconduct he would not have entered a guilty plea that foreclosed his right to appeal the denial of his motion to suppress the evidence of the induction ceremony.

Barone, Carrozza, Lepore, and Tortora filed similar § 2255 petitions. All of the petitions presented complex questions, including whether the law with regard to Fourth Amendment "standing" as it exist-

ed in 1991 or as it had been clarified by *Minnesota v. Carter* governed. These issues were briefed and argued at hearings on October 28, 2002 and March 6, 2003.

In June 2002, John Connolly, the former FBI Special Agent who had been the informant "handler" for Bulger, Flemmi, and Mercurio, was convicted of RICO and other offenses, including attempting to obstruct justice in the *Salemme* case. *See Connolly, supra.* Connolly was prosecuted by a specially constituted Department of Justice Task Force led by John Durham, a federal prosecutor based in Connecticut. Following Connolly's conviction, the Task Force continued to investigate other possible crimes by Connolly and his colleagues. It was well known that this investigation was continuing.

Soon after Connolly's conviction, Jordan contacted a member of the Task Force. He stated that he had committed perjury in the Barone trial when he testified that Ferrara had ordered Barone to murder Limoli. Jordan also said that Auerhahn and the investigators knew that he had committed perjury. Jordan expressed fear that the Task Force would soon discover that he had lied under oath and said that he wanted to reveal this information himself.

Durham promptly began an investigation of Jordan's allegations. In August 2002, Jordan told a polygraph examiner that Barone never said that Ferrara ordered the Limoli murder and that he had told the government that he had lied about Ferrara's involvement in the Limoli killing. The polygrapher found that there was no deception indicated by Jordan's statement. *See* M.B.D. No. 0210235, Aug. 28, 2002 Tr. at 9–10.[13] Knowing that Barone and Ferrara had pending § 2255 petitions, to which Jordan's allegations might be important, in August 2002 Durham informed the court of them and of his investigation.

In January 2003, Durham informed this court that he intended to disclose to Barone and Ferrara Jordan's allegations, and related information generated by his investigation. The United States Attorney for the District of Massachusetts later told Durham that his Office, which was representing the government in connection with the § 2255 petitions of Ferrara and his former codefendants, would do so instead. The anticipated disclosures to petitioners were not promptly made.

Nevertheless, Ferrara and Barone learned of Jordan's allegations. They were allowed to amend their § 2255 petitions to allege that they were entitled to relief in part because the government improperly failed to provide them with material exculpatory information and knowingly used perjured testimony against them.

Among other things, Ferrara asserted that he is actually innocent of the charges arising out of the Limoli murder to which he pled guilty. He also contended that the government's failure to disclose the very important exculpatory information that Jordan's recantation represents induced him to plead guilty to offenses that he did not commit.

---

**13.** The results of a polygraph examination may not ordinarily be admissible. *United States v. Black*, 78 F.3d 1, 7 (1st Cir.1996), citing *United States v. Scarborough*, 43 F.3d 1021, 1026 (6th Cir.1994). However, in this case the government agreed that the court could consider the polygraph examiner's report. *See* Gov. Report to Court Pursuant to Court's Order of August 14, 2003 (Docket No. 68) at 2; Aug. 26, 2003 Tr. at 3; Sept. 3, 2003 Tr. at 6. While the results of the polygraph examination of Jordan are consistent with the facts found by the court, they are not material to those findings. Rather, the results of the polygraph examination merely reinforce the conclusions that the court has reached independently, on the other evidence presented.

In a series of conferences, it became clear to the court that if Ferrara and/or Barone were entitled to relief on their apparently strongest respective claims that they were denied Due Process because the government had withheld material exculpatory information, their other claims would have no practical significance. Therefore, it was agreed that the parties and the court would focus on Jordan's contention that he had told the government he had falsely claimed that Ferrara ordered Barone to murder Limoli.

The court conducted evidentiary hearings in September 2003. The witnesses included Jordan, Coleman, Buckley, Sullivan, and Auerhahn. The court sequestered the witnesses and, over the government's objection, insisted on a certain order of the witnesses in an effort to obtain spontaneous testimony to the maximum extent possible.

As indicated earlier, after Coleman testified that he had prepared a memorandum concerning Jordan's recantation, the government found it and produced it for the first time. The evidentiary hearings resulted in the findings of fact described earlier, including the court's conclusion that Jordan did tell the government that Barone had not said that Ferrara ordered the Limoli murder, but rather had asserted that he did not obtain permission for the killing.[14]

In 2003, the court decided, orally, that the government's failure to disclose Jordan's very important exculpatory information had denied Barone Due Process and that he was entitled to a new trial if the case were not otherwise resolved. *See* Oct. 3, 2003 Tr.; Oct. 8, 2003 Order. Shortly before that decision, the government discovered and disclosed that in contributing to the Presentence Report, Auerhahn had erroneously informed this Probation Department that the maximum sentence for Barone's offense was life in prison, rather than twenty-years.[15] Neither the Probation Department, defense counsel, nor the court discerned the error. As a result, Barone had been sentenced in 1994 to life in prison for a crime—conspir-

**14.** With regard to the findings of facts, the court has applied the Federal Rules of Evidence as required by Federal Rule of Evidence 1101. Its factual findings required determinations of credibility. These were made in the manner that the court instructs juries to decide questions of credibility. The court considered the demeanor of the witnesses, which it had an opportunity to scrutinize. It considered the extent to which a witness's testimony was corroborated or contradicted by the testimony of other witnesses. It considered the extent to which what the witness said made sense or did not make sense. The court considered the motive that any witness might have to lie.

The court has found it appropriate to credit some but not all of what some of the witnesses said. In doing so, it considered whether differences in the evidence are explained by innocent differences in perception or memory, or by contrivance. The court found that some witnesses were right about some things and wrong about others. Jordan, for example testified that the meeting in Minnesota occurred before the meeting in Salt Lake City. The records indicate this was incorrect. However, on a number of important points, the court has found that his testimony was corroborated by the testimony of other witnesses and, in any event, correct.

The court has also found that Coleman was an honest and able law enforcement officer. As every witness testified, he was dedicated to combating the LCN. There is no reason that he would write a false report concerning Jordan's recantation. By September 2003, Coleman was an older man, who was taking medication for a heart condition that affected his memory. While some of his testimony was inaccurate, the court is persuaded that his handwritten memorandum is a reliable account of what Jordan told Auerhahn and Coleman in 1991.

**15.** The government explained that Auerhahn discovered the error and informed his colleagues.

ing to murder Limoli to increase his position in the Patriarca Family—that had a statutory maximum penalty of twenty years.

Barone and the government promptly entered into a binding plea agreement that provided for his immediate release. Although the court made no finding as to whether there was an adequate factual basis for the Limoli murder charge, it accepted the plea agreement. Barone was released on October 24, 2003, after serving many years in federal prison on charges on which he had not been fairly convicted.

## III. ANALYSIS

### A. *Summary of Analysis*

As explained below, Ferrara's § 2255 petition is, like Barone's, meritorious, and he too is entitled to appropriate relief. As indicated earlier, Ferrara's amended petition asserts several claims based on the government's failure to disclose to him material exculpatory information. In essence, Ferrara's claims fall into two categories. First, he asserts that the government failed to disclose material exculpatory information regarding the LCN induction ceremony which, if divulged, would have resulted in the suppression of the evidence of it and a much lower sentence for Ferrara. Second, Ferrara contends that he is actually innocent of the charges relating to the Limoli murder. Ferrara states that the government's unlawful failure to disclose material exculpatory information negating his guilt on those charges deprived his counsel of the ability to advise him properly, prompted Ferrara to plead guilty to them to avert the risk of a wrongful conviction resulting in a life sentence, and deprived the court of the ability to discern that there was not a factual basis for his plea to the Limoli murder charges.

The primary relief that Ferrara seeks is a resentencing. Among other things, he asserts that the charges involving the Limoli murder should not be included in calculating the Guideline range for his sentence and in ultimately determining a reasonable sentence. Ferrara contends that in 1992 the maximum properly calculated Guideline sentence for his crimes would have been 188 months in prison. If a 188 month sentence had been originally imposed, Ferrara would have been released on July 8, 2003. Therefore, he would be entitled to be released immediately if he were now resentenced to 188 months in prison.

The government has presented several defenses to Ferrara's petition. From the outset the government has argued that Ferrara's guilty plea extinguished any right that he would otherwise have had to a decision on the merits of the claims that the government unlawfully failed to disclose to him material exculpatory information concerning the motion to suppress the intercepted evidence of the LCN induction ceremony and concerning the Limoli murder charges. *See Tollett,* 411 U.S. at 266, 93 S.Ct. 1602. In addition, more than three years after the government responded to Ferrara's original petition, the government for the first time suggested that Ferrara's claims would involve the application of a new constitutional rule and, therefore, were barred by the doctrine announced by the Supreme Court in *Teague, supra.* The government also contends that Jordan's recantation represented only impeaching information that the government was not required to disclose pursuant to the Supreme Court's decision in *United States v. Ruiz,* 536 U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002). Finally, the government argues that even if Ferrara is not held responsible for the Limoli murder, at any resentencing he should be found to be responsible for the Corlito and DiFronzo murders. Therefore, the government contends that the Guidelines

would prescribe a life sentence, and the court should again sentence Ferrara to twenty-two years in prison.

As described in detail below, each of the government's arguments is unpersuasive. The government's *Teague* defense was waived by not being raised in a timely manner. Moreover, it is not meritorious. Ferrara is relying on rules of constitutional law that were well-established when his conviction became final in 1992, the rules of *Brady v. Maryland, supra,* and *Brady v. United States, supra.*

Ferrara's guilty plea may have extinguished his right to reopen the merits of his motion to suppress the electronic surveillance of the LCN induction ceremony. The court is not now deciding that question.

His guilty plea does not, however, preclude the court from deciding whether his convictions on the Limoli murder charges should stand. To the contrary, as many Circuits have found, the Supreme Court in *Brady v. United States, supra,* made clear that impermissible conduct by the government can: undermine the reliability of a guilty plea; result in the acceptance of a guilty plea from a defendant who might actually be innocent; and therefore subject that plea to being vacated in a § 2255 proceeding.

Contrary to the government's contention, *United States v. Ruiz, supra,* confirms rather than contradicts this conclusion. Moreover, Jordan's recantation was not a prior inconsistent statement that merely impeached his trial testimony concerning the Limoli murder. Rather, his reports that Barone said that he had not obtained Ferrara's permission to kill Limoli directly negated Ferrara's guilt concerning the Limoli murder charges.

With regard to the merits, the government's misconduct utterly undermines the court's confidence in the outcome of Ferrara's case. Ferrara may well be innocent

of the Limoli murder charges. In any event, there is a reasonable probability that if the constitutionally required disclosures had been made, Ferrara would not have pled guilty to them, would not have been convicted of them at trial, and would not have been held responsible for them at sentencing.

In these circumstances, the government's misconduct in not disclosing Jordan's recantation deprived Ferrara of Due Process.

The parties and the court agree that a new trial would not be practical. Therefore, the most appropriate remedy is to resentence Ferrara.

The government agrees that in the circumstances as the court has found them, the Limoli murder charges should not be relied upon at sentencing. Contrary to the government's contention, there is insufficient evidence to prove even by a preponderance that Ferrara is responsible for the Corlito or DiFronzo murders. Therefore, the Guideline range for Ferrara's sentence must be calculated without regard to any of the murders.

As the parties and the court also agree, in view of the Supreme Court's recent decision in *Booker, supra,* the court must consider the Guidelines as advisory and determine the most appropriate, reasonable sentence to impose. On Ferrara's theory, without the murders the Guideline range for his sentence in 1992 would have been 151–188 months. If given a 188 months sentence, he would have been released in July 2003. On the government's theory, absent the murders, the Guideline range would have been 210–262 months. If Ferrara's guilty plea only resulted in a sentence at the low end of the Guideline range, rather than in a downward departure, he would have been released in February 2005. Therefore, a hearing at which Ferrara will be resentenced without re-

gard to the murders will be conducted promptly.

B. *Ferrara Has Stated A Claim On Which Relief May Be Granted And That Claim Is Not Barred By The Teague v. Lane Doctrine*

The court must decide whether Ferrara's claims are barred by the *Teague* doctrine before considering their merits. *See Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). Therefore, the government's belated *Teague* argument is being addressed first.

For the reasons described below, Ferrara has stated a claim for which relief may be granted and that claim is not barred by the *Teague* doctrine. The government has waived its *Teague* defense by failing to raise it in a timely fashion, but even if the court were to consider the defense, it would not apply in this case.

As indicated earlier, Ferrara's conviction became final in 1992. In 1963, the Supreme Court held in *Brady v. Maryland, supra,* that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment...." This principle was clearly established well before Ferrara's case concluded. *See Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.1988). It was also then clearly established that suppressed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The Supreme Court had also held that a reasonable probability of a different result includes going to trial rather than pleading guilty. *See Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *Miller,* 848 F.2d at 1322.

In addition, in 1992, it was clearly established by the Court's 1970 decisions in *Brady v. United States,* 397 U.S. 742, 757, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), and its progeny that misrepresentations or other misconduct by the government could render a guilty plea not "intelligent" and, therefore, provide a basis for granting a petitioner relief in a habeas corpus proceeding. *See White v. United States,* 858 F.2d 416, 422 (8th Cir.1988); *Miller,* 848 F.2d at 1318–22; *Campbell v. Marshall,* 769 F.2d 314, 321 (6th Cir.1985).

Contrary to the government's contention, *Tollett, supra,* does not qualify this conclusion. *Tollett* bars a petitioner from litigating in a habeas proceeding most *independent* claims of constitutional violations that occurred prior to the entry of his guilty plea. 411 U.S. at 267, 93 S.Ct. 1602. It does not alter the holding of *Brady v. United States* that a petitioner may on collateral review seek relief for the suppression of material evidence negating his guilt, suppression which deprived him of the ability to decide intelligently whether to plead guilty and deprived the court of the capacity to evaluate the truthfulness of his plea.

Therefore, the rules on which Ferrara relies are not new constitutional rules of criminal procedure which, pursuant to *Teague,* 489 U.S. at 299–301, 109 S.Ct. 1060, do not usually provide a basis for relief in a habeas proceeding. In any event, as noted *supra,* the government's *Teague* defense was waived because it was not timely presented and it would be inappropriate for the court to exercise its discretion to permit it to be relied upon in this case.

■ In *Teague,* the Supreme Court decided that a new constitutional rule of criminal procedure will not be announced in a case involving collateral review unless that new rule would be applied retroactive-

ly. *See* 489 U.S. at 299–301, 109 S.Ct. 1060. Courts "must determine, as a threshold matter, whether granting [a petitioner] the relief he seeks would create a 'new rule.'" *Penry v. Lynaugh,* 492 U.S. 302, 313, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). However, the *Teague* rule is not jurisdictional. 489 U.S. at 300, 109 S.Ct. 1060. Rather, it may be waived if it is not properly raised. *Id.; Schiro v. Farley,* 510 U.S. 222, 229, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994); *Wilmer v. Johnson,* 30 F.3d 451, 454 (3rd Cir.1994).

■ At the final hearing on April 1, 2004, more than three years after the government responded to Ferrara's original petition, and after the court considered numerous briefs and conducted many hearings, the government for the first time mentioned that Ferrara's claims might be barred by the doctrine announced by the Supreme Court in *Teague, supra. See* Apr. 1, 2004 Tr. at 17–18. After the case was taken under advisement, the government, without the authorization of the court, for the first time filed a memorandum addressing this issue. *See* Apr. 6, 2004 Gov. Supp. Memo at 1–5 (Docket No. 153).

> The government acknowledges that it had abundant opportunities to raise the *Teague* claim well before it did. Indeed, inasmuch as petitioner's original § 2255 claim depends on the court's adoption of the *Miller* line of cases, the government could have interposed a *Teague* defense in its initial response [filed on September 8, 2000]. And it certainly could have done so as well at many junctures during the course of the more recent litigation regarding the petitioner's amended petition.

Gov. Mem. Pursuant to Court Order of April 9, 2004 (Docket No. 155) at 13–14.

When, as here, the 1989 decision in *Teague* preceded the filing of the habeas petition and the government should have been aware of the purported defense, "the appropriate time for arguing that *Teague* barred consideration of petitioner's [claim is] in the answer to the habeas petition. . . ." *Wilmer,* 30 F.3d at 454–55. In the instant case, as in *United States v. Knox,* 2004 WL 442629 at *3 (N.D.Ill. Mar.9, 2004):

> The government's *Teague* argument comes too late in the day. *Teague* is a non-jurisdictional rule that is subject to waiver by the government. *See Schiro v. Farley,* 510 U.S. 222, 229, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). The government waived it here by failing to mention it in its answer to [petitioner's] motion.

*Id.* (citations omitted).

The court recognizes that it has the discretion to permit the government to raise a *Teague* defense belatedly or, indeed, to consider the implications of *Teague sua sponte. See Caspari,* 510 U.S. at 389, 114 S.Ct. 948; *Schiro,* 510 U.S. at 229, 114 S.Ct. 783; *Wilmer,* 30 F.3d at 455. In the circumstances of this case, however, to do so would be unfair to Ferrara and injurious to the interests of the administration of justice. *See Schiro,* 510 U.S. at 229, 114 S.Ct. 783; *Wilmer,* 30 F.3d at 454–55; *Knox,* 2004 WL 442629 at *3.

The government admits that it could and should have asserted any *Teague* defense in answering Ferrara's original petition. Counsel for Ferrara and the court have unnecessarily invested many days, over too many years, in addressing issues that, as a practical matter, became moot after Ferrara learned in 2003 of Jordan's allegations of extreme government misconduct and Ferrara amended his petition. That alleged government misconduct has now been proven. The changing nature of

the factual and legal issues caused by the government's misconduct has frustrated Ferrara's reasonable expectation that the merits of his petition would be decided efficiently, and his hope that his release would be expedited rather than delayed.

The respondent raised the *Teague* claim only after this court signaled that the government might well lose this case by granting relief to Barone and expressing its view that, as Ferrara argued, the Second Circuit's decision in *Miller, supra,* provides the applicable standard.

To permit a belated *Teague* defense in these circumstances would encourage the government to believe that when it has reason to foresee defeat it can keep a petitioner incarcerated and a court preoccupied by repeatedly raising a succession of defenses. This result is not in the interest of the administration of justice. *See Knox,* 2004 WL 442629 at *3 (denying a belated request to present a *Teague* defense because the government "did not mention *Teague* until after the Court had ruled that [certain] claims would not be dismissed. Were the Court to allow the government to raise the issue now, we would effectively be saying that the parties' briefs on a contested matter are merely a dry run, with a second go-around after they see what works and what does not work.")

Moreover, if the government were now able to present a valid *Teague* defense, a dismissal of Ferrara's petition without an analysis of its merits would keep from the public record findings of extremely serious government misconduct by a prosecutor who continues to represent the United States in this District. This result too is not in the interest of the administration of justice. Therefore, the government's *Teague* defense has been waived.

■ In any event, the government does not have a meritorious *Teague* defense to Ferrara's petition. In essence, it does not

appear to be an oversight that caused the government to fail in more than three years of litigation to assert a *Teague* defense. Rather, it appears that the government did not argue *Teague* because the defense had not even been raised, let alone succeeded, in all but one of the reported cases presenting comparable issues. *See United States v. McCleary,* No. 95–6922, 1997 WL 215525 (4th Cir. May 1, 1997); *Sanchez v. United States,* 50 F.3d 1448 (9th Cir.1995); *United States v. Claudio,* 44 F.3d 10, 13 (1st Cir.1995); *United States v. Wright,* 43 F.3d 491 (10th Cir. 1994); *Tate v. Wood,* 963 F.2d 20 (2d Cir.1992). *But see Matthew v. Johnson,* 201 F.3d 353, 358–60 (5th Cir.2000).

As the government explained on April 1, 2004, only a "quick reading" of *Matthew,* which had been cited by Ferrara, prompted its belated *Teague* argument. Apr. 1, 2004 Tr. at 17–18. This court finds that: the Fifth Circuit's decision in *Matthew* is an anomaly; its reasoning is not persuasive; and it is distinguishable on the facts from the instant case.

In deciding whether *Teague* bars a habeas petitioner's claim, the court must focus on the law as it existed when his conviction became final. *Teague,* 489 U.S. at 301, 109 S.Ct. 1060.

> In general ... a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.... [A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final.

*Id.* (emphasis omitted). A result may be "dictated by precedent" even if there is no case precisely on point. *See Stringer v. Black,* 503 U.S. 222, 228–31, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). More specifically, as Professor Chemerinsky has explained:

*Stringer v. Black* is important in indicating that there need not be a case directly on point to prevent a court from concluding that there is a new rule. The application of a rule to a different circumstance does not create a new rule where the application is a logical and foreseeable extension of the law.

E. Chemerinsky, *Federal Jurisdiction* 903 (4th ed., 2003).

█ In addition, "rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule." *Williams v. Taylor,* 529 U.S. 362, 382, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

"If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule.... Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent."

*Id.* (quoting *Wright v. West,* 505 U.S. 277, 308–09, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (Kennedy, J., concurring in judgment)).

Ferrara relies on well-established rules of general application—the rules enunciated in 1963 in *Brady v. Maryland, supra,* and its progeny, and in 1970 in *Brady v. United States, supra,* and its progeny. The instant case neither imposes any new obligation on the government nor breaks any new ground. Rather, the decision in this case is dictated by precedent.

Once again, in *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. 1194, the Supreme Court held, in 1963, that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." In 1985, in *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375, the Court held that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See also Kyles v. Whitely,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

█ Since at least 1984, the Supreme Court has treated the "materiality" requirement for *Brady v. Maryland* claims and the "prejudice" requirement for ineffective assistance of counsel claims as synonymous. *See Hill v. Lockhart,* 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (stating that "the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution...."); *Ruiz v. United States,* 339 F.3d 39, 43 (1st Cir.2003) (*"Brady [v. Maryland* ] claims are subject to the same prejudice requirement as ineffective-assistance claims," citing *Strickland* and *Bagley* ); *Miller,* 848 F.2d at 1321–22. To establish "materiality" or "prejudice," a petitioner must prove a "reasonable probability that ... the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see Bagley,* 473 U.S. at 682, 105 S.Ct. 3375; *Ruiz v. United States,* 339 F.3d at 41. The Supreme Court held in 1985 that a "different result" includes a "reasonable probability that [a defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59, 106 S.Ct. 366; *Miller,* 848 F.2d at 1322. There was nothing new about these propo-

sitions in 1992, when Ferrara's conviction became final.

In 1970, in *Brady v. United States, supra,* the Supreme Court essentially anticipated the instant case. *Brady v. United States* involved a petitioner who alleged that he had pled guilty to kidnaping because the trial judge was unwilling to allow him to have a non-jury trial, at which the maximum punishment would have been life in prison, and the petitioner could have been sentenced to death if he was convicted by a jury. *See* 397 U.S. at 743, 90 S.Ct. 1463. Nine years after Brady's plea, the Supreme Court decided that making the risk of death the price of a jury trial was unconstitutional. *See United States v. Jackson,* 390 U.S. 570, 582, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). However, the Court declined to consider the merits of Brady's claim because it found that his guilty plea was voluntary, knowing, and intelligent. *Brady v. United States,* 397 U.S. at 758, 90 S.Ct. 1463. This conclusion was based, in part, on the implicit finding that Brady's guilty plea had not been induced by any misrepresentation or other impermissible conduct by the government, *id.* at 757, 90 S.Ct. 1463, and on the express conclusion that nothing in the record suggested that Brady had not committed the offense, *id.* at 758, 90 S.Ct. 1463.

The reasoning of *Brady v. United States* is important to the instant case. The Court wrote that, "[w]aivers of constitutional rights [including the right to a trial,] not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* at 748, 90 S.Ct. 1463. In a footnote to this statement, the Court identified as a relevant circumstance the ability to make "an intelligent assessment of the relative advantages of pleading guilty." *Id.* at 748 n. 6, 90 S.Ct. 1463. The Court also recognized that "[o]ften the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted." *Id.* at 756, 90 S.Ct. 1463.

The Court found that Brady "had competent counsel and full opportunity to assess the advantages and disadvantages of a trial as compared with those attending a plea of guilty...." *Id.* at 754, 90 S.Ct. 1463. In these circumstances, it held that Brady's plea was entered intelligently as well as voluntarily. *Id.* at 754–55, 90 S.Ct. 1463.

*Brady v. United States* established a general rule, with an express exception for cases like Ferrara's. It held that:

> A defendant is not entitled to withdraw his plea *merely* because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, *absent misrepresentation or other impermissible conduct by state agents,* a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.

*Id.* at 757, 90 S.Ct. 1463 (emphasis added, citation omitted). As the emphasized language indicates, the Court did not intend the general rule of *Brady v. United States* to apply to cases, such as the instant case, in which the intelligent character of a guilty plea is undermined by material misrepresentations or other prejudicial misconduct by the government, particularly where, as here, the petitioner asserts his actual innocence.

The Court made the reasons for this exception clear. It was concerned that if government misconduct deprived the de-

fendant, his counsel, and the court of material evidence negating guilt, guilty pleas might be offered by, and accepted from, innocent individuals. *Id.* at 757–58, 90 S.Ct. 1463. More specifically, the Court wrote:

> We would have serious doubts about this case if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves. But our view is to the contrary and is based on our expectations that courts will satisfy themselves that pleas of guilty are voluntary and intelligently made by competent defendants with adequate advice of counsel and that there is nothing to question the accuracy and reliability of the defendants' admissions that they committed the crimes with which they are charged. In the case before us, nothing in the record impeaches Brady's plea or suggests that his admissions in open court were anything but the truth.

*Id.* at 758, 90 S.Ct. 1463.

As this statement indicates, the decision in *Brady v. United States* was based on the understanding that the defendant and his counsel had the information necessary to evaluate the relevant circumstances, including the strength of the government's case, and the court had the information necessary to evaluate whether the offered admission of guilt was reliable, rather than an effort by an innocent individual to avert the more severe consequences of a potential wrongful conviction.

Where, as in the instant case, the government withholds material information that negates guilt, even competent counsel cannot adequately advise a defendant and the court cannot properly conclude that "there is nothing to question the accuracy and reliability of the defendant['s] admissions." *Id.* Thus, there was a compelling reason for the Supreme Court to have

expressly excepted from the general rule of *Brady v. United States* cases, such as this one, that involve misrepresentation or other government misconduct that undermines the ability of a defendant to plead guilty "intelligently" and the ability of the court to evaluate the truthfulness of his plea.

This exception parallels another exception to the usual finality of a guilty plea that the Supreme Court recognized in *McMann v. Richardson,* 397 U.S. 759, 774, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). In *McMann,* the Court again addressed the question of whether a later change in the law could benefit a defendant who pled guilty with advice of counsel. *Id.* at 765–66, 90 S.Ct. 1441. The case did not involve any alleged misrepresentations or misconduct by the government. In denying McMann's petition, the Court wrote:

> [W]hen the defendant waives his state court remedies and admits his guilt, he does so under the law then existing; further, he assumes the risk of *ordinary* error in either his or his attorney's assessment of the law and facts. Although he might have pleaded differently had later decided cases then been the law, *he is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act.*

*Id.* at 774, 90 S.Ct. 1441 (emphasis added).

Once again, the Court was relying on the adequacy of the advice of counsel in finding that a knowing and intelligent plea would usually be immune from collateral attack. In the instant case, however, there was no "ordinary error" by Ferrara's counsel in assessing the facts. If a "serious dereliction" by defense counsel had deprived Ferrara of advice given with knowledge of material information negating guilt, *McMann* would permit collateral review and an appropriate remedy. *Id.* In

the instant case, it was the "serious dereliction" by the government that deprived Ferrara and his counsel of such information, and has rendered his guilty plea not "intelligent." *Brady v. United States*, 397 U.S. at 756–57, 90 S.Ct. 1463, expressly permits relief to be granted in such a case.

Contrary to the government's contention, this conclusion is not qualified by *Tollett, supra.* In *Tollett,* the Supreme Court held that a defendant who had pled guilty was "not automatically entitled to federal collateral relief on proof that the indicting grand jury was unconstitutionally selected." 411 U.S. at 266, 93 S.Ct. 1602. Rather, the Court explained, "[t]he focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an *antecedent* constitutional infirmity." *Id.* (emphasis added). The Court construed *Brady v. United States* and *McMann* as holding that when a defendant pleads guilty:

he may not thereafter raise *independent* claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. *He may only attack the voluntary and intelligent character of the guilty plea* by showing that the advice he received from counsel was not within [the range of competence demanded of attorneys in criminal cases].

*Id.* at 267, 93 S.Ct. 1602 (emphasis added).

*Tollett* does not bar Ferrara's claim that the government's failure to produce material evidence negating his guilt rendered his plea not intelligent. He is not asserting an "independent" claim. Rather, Ferrara's claim goes to the heart of his counsel's ability to advise Ferrara adequately whether to plead guilty; Ferrara's ability to assess intelligently that advice; and the court's ability to evaluate the truthfulness of his plea. *See Brady v. United States,* 397 U.S. at 758, 90 S.Ct. 1463; *Wright,* 43

F.3d at 496; *Fambo v. Smith,* 433 F.Supp. 590, 599 (W.D.N.Y.), *aff'd* 565 F.2d 233 (2d Cir.1977) (per curiam). As the Tenth Circuit wrote in *Wright:*

"[w]ithout [the clearly exculpatory] evidence before it, the trial court which accepted the plea could not, in fact, satisfy itself in any meaningful sense that petitioner's guilty plea was voluntarily and intelligently made by an informed defendant with adequate advice of counsel, and that there was nothing to question the accuracy and reliability of this defendant's admission that he had committed the crime with which he had been charged."

*Wright,* 43 F.3d at 496 (quoting *Fambo,* 433 F.Supp. at 599).

In 1975, in *Menna v. New York,* 423 U.S. 61, 62 & n. 2, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975), the Supreme Court reiterated that the bar to litigation of constitutional claims in habeas proceedings imposed by *Brady v. United States* and *Tollett* applies only when those claims do not raise questions of whether the defendant actually committed the offense or whether his guilty plea was truly knowing and intelligent. More specifically, the Court wrote:

The point of [*Brady v. United States* and *Tollett* ] is that a counseled plea of guilty is an admission of factual guilt so reliable that, *where voluntary and intelligent,* it quite validly removes the issue of factual guilt from the case. In most cases, factual guilt is a sufficient basis for the State's imposition of punishment. *A guilty plea, therefore, simply renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established.*

*Id.* (emphasis added).

Once again, in the instant case, Ferrara contends that he is not guilty of the

charges involving the Limoli murder to which he pled guilty; his plea was not "intelligent" because he and his counsel were improperly deprived of material information negating his guilt and seriously undermining the credibility of the crucial witness against him on those charges; and the court now has substantial reason to question the factual basis for the plea to those offenses. In the language of *Menna*, Ferrara has alleged a constitutional violation logically inconsistent with the valid establishment of factual guilt. Thus, *Menna* does not foreclose Ferrara's claim in this case.

Rather, as the Sixth Circuit held in 1985, "the Supreme Court did not intend to insulate all misconduct of constitutional proportions from judicial scrutiny solely because that misconduct was followed by a plea which *otherwise* passes constitutional muster as knowing and intelligent." *Campbell v. Marshall*, 769 F.2d 314, 321 (6th Cir.1985) (emphasis added). As the Sixth Circuit found, the government's improper failure to disclose exculpatory evidence can undermine the voluntary and intelligent nature of the plea. *Id.* at 318, 321. In 1988, the Eighth Circuit agreed. *See White*, 858 F.2d at 422.

Also in 1988, the Second Circuit decided *Miller, supra.* In *Miller*, the Second Circuit vacated a plea of not guilty by reason of insanity to murder charges because the government had withheld from the defendant material evidence that another person had committed the crimes in question. *See* 848 F.2d at 1322. In doing so, the court utilized the principles applicable to defendants who enter a plea of guilty. *Id.* at 1319, 1320.

The Second Circuit first wrote that, "[i]t is by now [in 1988] well established that a person accused of a crime has a due process right to require the prosecution to turn over to him any material exculpatory evidence in its possession," and cited *Bra-*

*dy v. Maryland*, 373 U.S. at 87. *Id.* at 1319. The court then explained that:

> In the absence of special circumstances, the validity of a plea of guilty is determined by reference to whether it was intelligent and voluntary. *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747; *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274. As a general matter, a plea is deemed "intelligent" if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way; it is deemed "voluntary" if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally. *See Brady v. United States*, 397 U.S. at 750, 90 S.Ct. 1463. The *Brady v. United States* Court made clear, however, that this test suffices only in the "absen[ce of] misrepresentation or other impermissible conduct by state agents." *Id.* at 757, 90 S.Ct. at 1473. Since a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case, *id.* at 756, 90 S.Ct. 1463, and of information that may be available to cast doubt on the fact or degree of his culpability, we conclude that even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution.

*Id.* at 1320 (emphasis added).

Although *Miller* was decided a year before *Teague*, the Second Circuit essentially found that its decision was compelled by the Supreme Court's decisions in *Brady v. Maryland* and *Brady v. United States*. The court in effect reasoned that a guilty plea should not be deemed truly "knowing"

or "intelligent" if the government has withheld material exculpatory information not known to the defendant and his counsel. *See Miller,* 848 F.2d at 1320. It also recognized that its reasoning and ruling were rooted in the fact that the general rule of *Brady v. United States* regarding the finality of guilty pleas included an express exception for cases involving misrepresentations or other government misconduct that taints such a plea. *Id.*

*Teague* was decided in 1989. Its holding that a petitioner in a habeas corpus proceeding may not receive the benefit of a new constitutional rule, unless the rule is retroactive, was intended to serve several important purposes. One purpose was to promote finality in criminal cases. As the Supreme Court explained, "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system." *Teague,* 489 U.S. at 309, 109 S.Ct. 1060.

Consistent with this interest in finality, the Supreme Court also sought to encourage defendants to raise claims for new constitutional rules on direct appeal, before their convictions became final. *Id.* at 306, 109 S.Ct. 1060. Thus, the Court stated that " '[h]abeas corpus has always been a collateral remedy.... It is not designed

as a substitute for direct review.' " *Id.* (quoting *Mackey v. United States,* 401 U.S. 667, 682, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in part and dissenting in part)); *see also Wright v. West,* 505 U.S. 277, 292, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *Jackson,* 443 U.S. at 332 n. 5, 99 S.Ct. 2781.

After 1989, various circuits followed *Miller* and found that a guilty plea would be vacated if it were demonstrated that the government had improperly withheld material exculpatory information from a defendant before he entered his plea. In those cases, neither the government nor the courts even raised the issue of whether such a claim was barred by *Teague. See Tate, supra; Wright, supra; Sanchez, supra; McCleary, supra.*

In the sole First Circuit case presenting the issue, "[t]he government assume[d] arguendo that *Brady* [*v. Maryland* ] might apply where a withholding of exculpatory information actually causes a guilty plea" and cited *Miller* for this proposition. *Claudio,* 44 F.3d at 15. The First Circuit, however, did not decide the issue because it found that the information the defendant claimed was withheld improperly "had no significance." *Id.*[16]

When Ferrara's conviction became final in 1992, it was clearly established that he

---

**16.** The First Circuit's decision in *United States v. Cordero,* 42 F.3d 697 (1st Cir.1994) is not inconsistent with *Miller* and the comparable cases in other circuits. After pleading guilty, in a direct appeal, Cordero sought review of the denial of his motion to suppress. *Id.* at 698. The First Circuit declined to decide the merits of his claim because *Tollett* held that "an unconditional guilty plea insulates virtually all *earlier* rulings in the case from appellate review." *Id.* (emphasis added). The First Circuit noted that *Tollett* expressly barred an individual who pled guilty from raising " 'independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.' "

*Id.* at 698–99, quoting *Tollett,* 411 U.S. at 267, 93 S.Ct. 1602. The denial of a motion to suppress is, at least usually, a claim that is "independent" of the issue of whether a plea was entered voluntarily and intelligently. *Id.; but see United States v. Barton,* 995 F.2d 931, 933 (9th Cir.1993). Ferrara's claim that the government's improper withholding of material evidence negating his guilt induced him to plead guilty to offenses relating to the Limoli murder that he did not commit does not involve consideration of a ruling that preceded his guilty plea and is not an "independent" claim. Rather, it directly involves the question of whether his plea was knowing and intelligent.

had a right to receive from the government material exculpatory evidence pursuant to *Brady v. Maryland. See Miller*, 848 F.2d at 1320. It was also clearly established that he had a right to relief if his guilty plea was not entered intelligently because the government improperly deprived him of material information negating his guilt. *See Brady v. United States, supra; Tollett, supra; Menna, supra; Miller, supra; Campbell, supra; White, supra.*

Contrary to the government's contention, the Supreme Court's 2002 decision in *United States v. Ruiz*, 536 U.S. 622, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002), does not indicate that Ferrara is barred from litigating his *Brady v. Maryland* claim or from being provided relief if he proves that claim. Rather, *Ruiz* supports this court's conclusions.

In *Ruiz* the Supreme Court held on a direct appeal of a defendant's sentence that the constitution does not prohibit the government from requiring a defendant to waive his right to impeachment information in return for a "fast-track" plea agreement that will result in a lower sentence. *See* 536 U.S. at 633, 122 S.Ct. 2450. The Court was not addressing the government's constitutional duty to provide a defendant with material information that tends to negate his guilt. Indeed, the Court referenced the interest in "securing those guilty pleas that are *factually* justified." *Id.* at 631, 122 S.Ct. 2450. It also noted that its enduring concern about the possibility that guilty pleas might be tendered by, and accepted from, innocent individuals was addressed by Ruiz's plea agreement. More specifically, the Court wrote:

> [T]he proposed plea agreement at issue here specifies that the Government will provide "any information establishing the factual innocence of the defendant [ ]." That fact, along with other guilty-

plea safeguards, *see* Fed. Rule Crim. Proc. 11, diminishes the force of Ruiz's concern that, in the absence of impeachment information, innocent individuals, accused of crimes, will plead guilty.

*Id.*

Quoting *Brady v. United States*, 397 U.S. at 748, 90 S.Ct. 1463, the Court reiterated that, "the Constitution insists, among other things, that the defendant enter a guilty plea that is 'voluntary' and that the defendant must make related waivers 'knowing[ly], intelligent[ly], [and] with sufficient awareness of the relevant circumstances and likely consequences.'" *Id.* at 629, 122 S.Ct. 2450. It then explained that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary ('knowing,' 'intelligent,' and 'sufficient[ly] aware.')." *Id.* at 629, 122 S.Ct. 2450 (emphasis omitted).

Therefore, *Ruiz* reemphasizes the importance of guilty pleas being entered intelligently. It does not alter the Supreme Court's ruling in *Brady v. United States*, 397 U.S. at 757, 90 S.Ct. 1463, that misrepresentations or other impermissible conduct by the government can undermine the intelligence of a plea. Nor does it erode the reasoning of *Miller*, 848 F.2d at 1322, that the improper failure of the government to disclose material information tending to negate guilt actually renders unintelligent and invalid a guilty plea.

Finding that in 1992 the government was constitutionally required to provide Ferrara with material information helpful to him with regard to guilt and punishment certainly does not impose any new obligation on it. *See Miller*, 848 F.2d at 1320. In *Strickler v. Greene*, 527 U.S. 263, 289 n. 35, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court stated in applying the rule of *Brady v. Maryland* to sentencing in a case before it on a petition

for habeas corpus, "[b]ecause our opinion does not modify *Brady,* we reject respondent's contention that we announce a 'new rule' today. *See Bousley v. United States,* 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)." *See also Basden v. Lee,* 290 F.3d 602, 611 (4th Cir.2002). This statement is equally applicable to the instant case.

*Bousley,* which the Court cited in *Strickler,* involved a contention that a guilty plea was not knowing and intelligent because the petitioner had not understood the elements of the offense. 523 U.S. at 618, 118 S.Ct. 1604. The Supreme Court wrote that:

> "[W]e do not believe that *Teague* governs this case. The only constitutional claim made here is that petitioner's guilty plea was not knowing and intelligent. There is surely nothing new about this principle...."

*Id.* at 620, 118 S.Ct. 1604. This statement too is equally applicable to the instant case.[17]

"*Teague* taught that, apart from the Supreme Court, federal habeas courts ought not act as innovators in the field of criminal procedure, thereby upsetting [ ] convictions because [ ] courts were not prescient and thus failed to comply with federal law that did not exist at the time they ruled." *O'Brien v. Dubois,* 145 F.3d 16, 23 (1st

Cir.1998) (citations omitted), *overruled on other grounds by McCambridge v. Hall,* 303 F.3d 24 (1st Cir.2002). Applying the *Miller* standard to the facts of this case is not an innovation, but merely a decision compelled by *Brady v. Maryland* and *Brady v. United States.*[18]

Moreover, it would be anomalous and adverse to the interests of justice to hold that Ferrara's claim is barred by *Teague.* As described earlier, *Teague* was intended, in part, to encourage defendants to raise all of their claims on direct appeal. *See Teague,* 489 U.S. at 306, 109 S.Ct. 1060. However, the government's misconduct prevented Ferrara from discerning his *Brady v. Maryland* claim and raising it in a direct appeal. In *Sanchez,* the court reasoned, in part, that:

> [I]f a defendant may not raise a *Brady* claim after a guilty plea, prosecutors may be tempted to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas. We therefore hold that a defendant challenging the voluntariness of a guilty plea may assert a *Brady* claim.

50 F.3d at 1453. This case demonstrates the wisdom of that reasoning.

In view of the foregoing, the court respectfully disagrees with the Fifth Circuit's ruling in *Matthew* that deciding in

---

**17.** The Supreme Court's decision in *Penry,* 492 U.S. at 312–19, 109 S.Ct. 2934 is also instructive. *Penry* presented on collateral review the issue of whether the jury instructions in a capital case properly addressed the need to consider mitigating factors in deciding whether the death penalty should be imposed. The Court found that Penry was not seeking a "new rule." Rather, habeas corpus review was permissible because its precedents previously established a right to jury instructions on mitigating factors and Penry's case merely called for an application of that principle. *Id.* at 315, 109 S.Ct. 2934.

**18.** Even if finding that Ferrara's guilty plea does not bar a decision on the merits of his

claim created a new rule, it would not create a new *constitutional* rule. Deciding that Ferrara may litigate his claims on collateral review does not resolve a constitutional question. Rather, it only decides the scope of the issues that can be litigated pursuant to 28 U.S.C. § 2255. Therefore, *Teague* would not bar Ferrara from benefitting from that rule. *See Teague,* 489 U.S. at 309, 109 S.Ct. 1060 ("Application of *constitutional* rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.").

habeas proceedings whether a *Brady v. Maryland* violation occurred prior to a guilty plea involves the creation of a "new rule" for *Teague* purposes. *See* 201 F.3d at 364. The government did not raise this defense in *Matthew*. *Id.* at 359 n. 6. Rather, the Fifth Circuit addressed the question *sua sponte*. *Id.* As described earlier, no other circuit has found that *Teague* bars claims like Ferrara's in this case.

In addition, the facts of the instant case distinguish it from *Matthew* in a significant way. "*Matthew* [did] not challenge the factual basis for his plea." *Id.* at 366. In contrast, Ferrara asserts that he is actually innocent of the relevant charges. Indeed, he did not plead guilty to the charges arising out of the murders of Corlito and DiFronzo and began proclaiming his innocence of involvement in the Limoli homicide before his sentencing. In essence, Ferrara alleges that because the government did not inform him that Jordan had recanted his statements that Ferrara ordered the murder of Limoli, Ferrara was induced to plead guilty and accept a twenty-two year sentence rather than run the risk of being wrongfully convicted and sentenced to life in prison. Once again, Ferrara contends that his counsel was improperly deprived of information necessary to provide adequate advice and the court was deprived of information necessary to discern that there was not a proper factual basis for the proffered plea. *See Brady v. United States*, 397 U.S. at 758, 90 S.Ct. 1463; *Wright*, 43 F.3d at 496. No such claim was made in *Matthew*. Therefore, even if *Matthew* was correctly decided on the facts before the Fifth Circuit, it is distinguishable in a material respect from the instant case.

Accordingly, the government waived its alleged *Teague* defense; that defense is, in any event, not meritorious; and Ferrara has stated a claim on which relief may be granted pursuant to *Brady v. United States* and its progeny.

### C. The Reasonable Probability Standard Applies

■ Ferrara asserts that the government violated its duty to disclose material evidence negating his guilt and, therefore, he was prejudiced in his ability to decide intelligently whether to plead guilty despite his actual innocence of certain charges. As discussed earlier, the tests for materiality and prejudice are the same. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Hill*, 474 U.S. at 57, 106 S.Ct. 366; *Miller*, 848 F.2d at 1321–22; *Ruiz v. United States*, 339 F.3d at 41. Ferrara must demonstrate a reasonable probability that, had the evidence at issue been disclosed, the result would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375.

In the context of this case, Ferrara can satisfy this burden by proving that "there is a reasonable probability that but for the withholding of the information [he] would not have entered the [guilty] plea but would have insisted on going to a full trial...." *Miller*, 848 F.2d at 1322; *see also Sanchez*, 50 F.3d at 1454 ("the issue in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant would have refused to plead and would have gone to trial"); *United States v. Stanley*, 97 Fed.Appx. 180, 181 (9th Cir.2004) ("there is not a reasonable probability under an objective standard that, but for the newly discovered evidence about the government's informant, Stanley 'would have refused to plead and would have gone to trial'"); *United States v. McCleary*, 112 F.3d 511, 1997 WL 215525 at *3 (4th Cir.1997) (table); *Indelicato v. United States*, 106 F.Supp.2d 151, 158 (D.Mass.2000) (Saris, J.); *Banks v.*

*United States,* 920 F.Supp. 688, 692 (E.D.Va.1996).[19]

In *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555, the Supreme Court explained the meaning of "reasonable probability." It wrote:

> *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different [result] with the evidence, but whether in its absence he received [a result] worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome ..." *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375.

*Id.* at 434, 115 S.Ct. 1555. *See also Strickler,* 527 U.S. at 289–90, 119 S.Ct. 1936. The First Circuit has regularly reiterated and applied this definition of "reasonable probability." *See United States v. Rodriguez–Marrero,* 390 F.3d 1, 28 (1st Cir.2004); *United States v. Casas,* 356 F.3d 104, 114 (1st Cir.2004); *Moreno–Morales v. United States,* 334 F.3d 140, 146 (1st Cir.2003); *Ellis v. United States,* 313 F.3d 636, 649 (1st Cir.2002); *United States v. Josleyn,* 206 F.3d 144, 152 (1st Cir.2000). The test of whether there is a reasonable probability that the defendant would have gone to trial if the prosecution had not withheld the exculpatory evidence "is an objective one, depending largely on the likely persuasiveness of the withheld information." *Miller,* 848 F.2d at 1322. It does not involve an "individualized inquiry" regarding the impact on a particular attorney or defendant. *Id.* at 1323. Rather:

> Given the nature of the question and the clear direction in *Hill* and *Strickland* that the likely outcome of a trial should be assessed "objectively, without regard for the 'idiosyncracies of the particular decisionmaker,'" *Hill,* 474 U.S. at 60–61, 106 S.Ct. 366 (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052), the habeas courts should [make] an objective evaluation of the likely impact that the withheld information would have had....

**19.** The relevant cases decided since *Miller* have generally employed the reasonable probability test. *Campbell,* 769 F.2d at 323, which was decided before *Miller,* and *White,* 858 F.2d at 422, which was decided several months after *Miller,* each employed instead a totality of the circumstances test. This court finds that the reasonable probability test which generally applies to alleged *Brady v. Maryland* violations also applies to Ferrara's effort to obtain relief for the government's improper failure to provide him with material information tending to negate his guilt of the charges at issue. However, the result in this case would be the same under the totality of the circumstances test.

The Sixth Circuit in *Campbell,* 769 F.2d at 324, and the Eighth Circuit in *White,* 858 F.2d at 423, considered such circumstances as: the certainty of the petitioner's factual guilt; whether there was a reasonable probability that but for the withholding of the information the petitioner would have not pled guilty; the magnitude of the constitutional violation; the degree of defense counsel's effectiveness; and any benefit, such as a lesser sentence, petitioner received in exchange for pleading guilty. In this case, the constitutional violation is clear and its magnitude is great. There is a serious question about whether Ferrara is actually guilty of the charges arising from the Limoli murder to which he pled guilty. There is a reasonable probability that if the government had disclosed Jordan's recantation, Ferrara would not have pled guilty to those charges. While Ferrara's plea averted a potential life sentence, it is only the government's misconduct that created a genuine risk that Ferrara would be convicted of any of the charges relating to murder and have received such a sentence. Therefore, the totality of the of the circumstances test also justifies granting Ferrara the relief he is receiving pursuant to the reasonable probability test.

*Id.* at 1323. *See also Sanchez,* 50 F.3d at 1454 ("we agree with the reasoning of the Second Circuit in *Miller* and hold that the test for whether the defendant would have chosen to go to trial is an objective one that centers on the 'likely persuasiveness of the withheld information.' "); *Indelicato,* 106 F.Supp.2d at 158 ("This test for materiality is an objective one.").

### D. *Ferrara Was Denied Due Process And Is Entitled To Relief*

■ To reiterate, Ferrara's claim for relief is not barred by *Teague,* and the appropriate standard for evaluating his claim is the "reasonable probability" standard. The inquiry must focus on whether, but for the improper suppression of evidence by the government, there is a reasonable probability that the outcome of the proceeding would have been different. That reasonable probability is demonstrated when the suppression of exculpatory evidence undermines confidence in the outcome. *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375.

As indicated earlier and elaborated below, the government improperly withheld from Ferrara evidence that tends to negate his guilt on the charges relating to the Limoli murder which, if proven, would have raised the maximum punishment provided by the Guidelines to life in prison. The information that the government suppressed also indicated that Jordan had committed perjury in his testimony to the grand jury. As any competent defense lawyer would have readily recognized, this admission alone would also have strongly influenced a jury not to believe any testimony by Jordan that Ferrara was involved in the Corlito and DiFronzo killings. Any such attorney would also have recognized that the government must have had little, if any, additional evidence implicating Ferrara in those crimes.

Ferrara never admitted to murdering Corlito and DiFronzo. Although he pled guilty to the charges relating to the Limoli murder, by the time of his sentencing he was proclaiming his innocence.

In these circumstances, if proper disclosure had been made, there is a reasonable probability that: Ferrara's counsel would not have advised him to agree to a twenty-two year sentence; Ferrara would not have pled guilty to the murder related charges; and if he had attempted to do so, the court would have found that there was not a proper factual basis to accept his plea to those charges. Rather, there is a reasonable probability that Ferrara would have gone to trial and not been convicted of the charges relating to the Limoli, Corlito, or DiFronzo murders. There is also a reasonable probability that, if convicted of the RICO charges or other alleged offenses, Ferrara would not have been held accountable for any of the murders as relevant conduct. Therefore, the suppressed information was material, and a *Brady* violation occurred. *See Strickler,* 527 U.S. at 281, 119 S.Ct. 1936; *United States v. Coppa,* 267 F.3d 132, 140 (2d Cir.2001).

In essence, the government's extreme misconduct prevented Ferrara's counsel from giving him adequate advice, prevented Ferrara from entering his guilty plea intelligently, and prevented the court from making a properly informed judgment concerning whether there was a factual basis for the plea. Thus, Ferrara is entitled to relief. *See Brady v. United States, supra; Miller, supra.* The reasons for these conclusions are as follows.

As described earlier, Count 3 charged that Ferrara conspired with Barone to murder Limoli for the purposes of gaining entrance to and maintaining and increasing positions in the Patriarca Family, in violation of 18 U.S.C. § 1952B(b)(1) and (2). Count 4 charged Ferrara and Barone with actually murdering Limoli for the

same purposes. The government's theory was that Ferrara was guilty on Count 4 because he aided and abetted the murder of Limoli by Barone and/or because the murder was in furtherance of their conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 646–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Patriarca*, 912 F.Supp. at 604–08. Similarly, Counts 1 and 2, Racketeering Act A–3(a) charged that Ferrara and Barone conspired to murder Limoli and A–3(b) charged that Ferrara commanded Barone to kill Limoli.

■ A conspiracy is an agreement to commit a crime. *See* First Circuit Pattern Instruction 4.03; *United States v. Piper*, 35 F.3d 611, 614–15 (1st Cir.1994); *United States v. Richardson*, 225 F.3d 46, 53 (1st Cir.2000). The government must prove that the co-conspirators "shared a general understanding about the crime." *United States v. Barnes*, 251 F.3d 251, 259 n. 2 (1st Cir.2001). It must also prove that the defendant intended that the underlying crime—the murder of Limoli—be committed. *Id.*

■ Similarly, "[t]o aid and abet means intentionally to help someone else commit a crime." First Circuit Pattern Jury Instruction 4.02; *United States v. Spinney*, 65 F.3d 231, 234–35 (1st Cir. 1995); *United States v. Loder*, 23 F.3d 586, 590–91 (1st Cir.1994). "This means that the government must prove beyond a reasonable doubt that [defendant] consciously shared the other person's knowledge of the underlying criminal act and intended to help him...." *United States v. Henderson*, 320 F.3d 92, 110 (1st Cir.2003).

Barone's statement that Ferrara wanted to kill him because Barone did not get permission from Ferrara to murder Limoli is evidence that Ferrara did not direct Barone to kill Limoli, Ferrara did not agree with Barone that Limoli should be killed, and that Limoli was not murdered to maintain or increase Ferrara's position

in the Patriarca Family. To the contrary, this statement indicates that Ferrara did not know in advance that Barone intended to kill Limoli and objected when he came to believe that Barone had done so. Thus, this evidence tends to negate directly Ferrara's guilt on Racketeering Acts A–3(a) and (b), and Counts 3 and 4.

Nevertheless, the government claims that Jordan's statement that Barone asserted that he did not get permission from Ferrara to murder Limoli is merely a prior inconsistent statement that could have been used to impeach Jordan's anticipated trial testimony and, therefore, was not required to be disclosed prior to Ferrara's plea pursuant to *United States v. Ruiz, supra.* *Brady v. Maryland* itself refutes this contention.

*Brady* admitted his participation in a murder but testified at trial that a coconspirator did the killing. *See Brady*, 373 U.S. at 84, 83 S.Ct. 1194. The government withheld a statement in which the coconspirator admitted that he was the actual killer. *Id.* The Supreme Court characterized this as "evidence favorable to the accused ... material ... to punishment." *Id.* at 87, 83 S.Ct. 1194. In *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375, the Supreme Court stated that in *Brady*, "the prosecutor failed to disclose exculpatory evidence." It contrasted the evidence in *Brady* to the evidence in *Bagley*, in which "[t]he prosecutor failed to disclose evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest." *Id.* The Court then wrote, "[i]mpeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule." *Id.*

In *United States v. Ruiz*, 536 U.S. at 632, 122 S.Ct. 2450, the Supreme Court held that, at least with regard to the particular defendant and the "fast-track" plea agreement at issue, "the Constitution does

not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." As *Brady* and *Bagley* confirm, however, in this case Jordan's report of Barone's statement was "exculpatory" evidence that relates directly to whether Ferrara is guilty of the offenses arising from the Limoli murder rather than mere "impeachment" evidence. Jordan's statement was also relevant to Ferrara's possible punishment because, if proven, the Limoli murder charges would have raised Ferrara's Guideline sentence to life in prison. Therefore, it is not the type of evidence that was at issue in *United States v. Ruiz.*

Barone's statement that he did not get permission from Ferrara to kill Limoli is "core" exculpatory evidence that the government was required to disclose if it was material. *Kyles*, 514 U.S. at 433–38, 115 S.Ct. 1555; *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375; *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936. In this case the suppressed exculpatory information was material because "there is a reasonable probability that but for [the withholding of the information Ferrara] would not have entered the [guilty] plea but would have insisted on going to trial." *Miller*, 848 F.2d at 1322; *see also Sanchez*, 50 F.3d at 1454; *Stanley*, 97 Fed.Appx. 180, 181; *McCleary*, 1997 WL 215525 at *3; *Indelicato*, 106 F.Supp.2d at 158; *Banks*, 920 F.Supp. at 692.[20] The government's failure to disclose Jordan's reports that Barone had stated that he did not get Ferrara's permission to kill Limoli completely undermines confidence in the outcome of Ferrara's case.

The government must under *Brady v. Maryland* disclose material exculpatory evidence that would be admissible at trial or that may itself be inadmissible but is "so promising a lead to strong exculpatory

---

**20.** The government acknowledges that if Jordan's recantation is material evidence that directly negates guilt, the government was required to disclose it to Ferrara before trial to satisfy the constitutional requirement that he be afforded Due Process. *See* Apr. 1, 2004 Tr. at 53–4. As described earlier, when Ferrara was indicted, Local Rule 42(a)(5) of the Local Rules of the United States District Court for the District of Massachusetts required that *Brady* material be disclosed within fourteen days of arraignment. A violation of that Rule might not always be a constitutional violation. However, a defendant has a constitutional right to receive *Brady* information sufficiently before trial to use it effectively. *See Coppa*, 267 F.3d at 142 (citing cases); *United States v. Pollack*, 534 F.2d 964, 973, (D.C.Cir.), *cert. denied*, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976). In this case, the government understood that it was required to make its *Brady* disclosures before the trial which had commenced by January 22, 1992, when Ferrara pled guilty. *See* Apr. 1, 2004 Tr. at 54. In any event, the constitution required that Ferrara's counsel be informed of Jordan's recantation well before trial to permit him to investigate it, develop trial strategy, research evidentiary issues, prepare for the opening statement he was scheduled to make on January 22, 1992, and subpoena witnesses. *See United States v. Snell*, 899 F.Supp. 17, 20 (D.Mass.1995).

The Jencks Act, 18 U.S.C. § 3500, does not qualify this conclusion. Exhibit 17 was written by Coleman and was a Jencks statement concerning him. *See United States v. Del Toro Soto*, 676 F.2d 13, 15–16 (1st Cir.1982); *United States v. Foley*, 871 F.2d 235, 238 (1st Cir.1989). Although the government had an arguable basis for not disclosing the actual document, *Brady v. Maryland* required that it at least give Ferrara, before trial, full and fair notice of the material exculpatory information contained in Coleman's handwritten memorandum, Exhibit 17. It is axiomatic that a statute is trumped by a constitutional right. *See Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 138, 2 L.Ed. 60 (1803); *INS v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Virtually all exculpatory information is contained in a Jencks statement of some witness. If the Jencks Act saved the government in this case, the rule of *Brady v. Maryland* would be eviscerated.

evidence that there could [have been] no justification for withholding it." *Ellsworth v. Warden,* 333 F.3d 1, 5 (1st Cir.2003). Barone's assertion that he did not get Ferrara's permission to kill Limoli meets this test.

If Barone's statement had been disclosed, a competent defense attorney would have recognized that evidence of it could be presented to the jury and would have powerful potential to refute any testimony that Ferrara was involved in the Limoli murder. More specifically, counsel could have sought to interview Barone and obtain his testimony. Barone, whose case had been severed and who was still awaiting trial, might have asserted his Fifth Amendment privilege not to testify.[21]

■ Nevertheless, if, as the government now implausibly contends, it would have called Jordan as a witness at Ferrara's trial despite his admission that he committed perjury, Jordan would have been permitted to testify about Barone's statement because it was an excited utterance admissible under Federal Rule of Evidence 803(2). Hearsay statements are admissible as excited utterances if there was: 1) a startling event; 2) a statement made while the declarant was subject to the influence of that event; and 3) a relation between the statement and the event. *See United States v. Bailey,* 834 F.2d 218, 228 (1st Cir.1987).

■ Barone's statement satisfies all three prongs of this test. First, the startling event was Ferrara's threat to kill Barone, which led him to flee the restaurant. *See United States v. Collins,* 60 F.3d 4, 8 (1st Cir.1995) (declarant "experienced the startling event of Collins threatening to return and shoot him"). Second,

Barone was still under the influence of the startling event at the time he said, "I did not get permission to kill Jimmy." As Jordan testified at Barone's trial, Barone was "hysterical" when he returned to the apartment after being threatened by Ferrara. *See* Sept. 8, 1993 Barone Tr. at 120; *Collins,* 60 F.3d at 8 (declarant was "visibly upset and agitated" when he made the statement). The fact that it took some time for Barone to run from the restaurant to his apartment does not mean that the startling event was too remote in time. *See United States v. Golden,* 671 F.2d 369, 371 (10th Cir.1982) (evidence admitted as excited utterance after declarant, who had been assaulted and feared for his life, drove twelve miles before making the statement). Third, the statement relates to the event because it was made by Barone to explain to Jordan why he was afraid of Ferrara and why they had to flee.

■ A competent defense lawyer would have also reasoned that if Jordan refused to testify, or altered his version of events, Coleman would be permitted to tell the jury about Jordan's report of Barone's excited utterance, which would have been admitted for the truth of Barone's statement that he did not get Ferrara's permission to murder Limoli. Jordan's confession that he had lied in his interviews and grand jury testimony was a statement that "so far tended to subject the declarant to ... criminal liability ... that a reasonable person would not have made the statement unless believe it to be true." Fed.R.Evid. 804(b)(3). Moreover, "corroborating circumstances clearly indicate the trustworthiness of [Jordan's] statement." *Id.* Thus, Coleman's testimony concerning it would have been expected to be admissible

21. If Barone asserted his Fifth Amendment privilege not to testify, he would have been an unavailable witness. *See Zeigler v. Callahan,* 659 F.2d 254, 269 (1st Cir.1981). If Barone was unavailable, his statement would probably have been admissible as a statement against interest under Federal Rule of Evidence 804(b)(3).

as a statement against Jordan's interest under Federal Rule of Evidence 804(b)(3).

More specifically, Jordan's July 26, 1988 plea agreement with the government was "contingent on [his] providing full and truthful information and testimony." Ex. 18. It gave him use and derivative use immunity for his truthful cooperation, and admission to the Witness Security Program. *Id.* Jordan correctly understood, however, that if he did not provide truthful information and testimony, he could: lose his immunity and be prosecuted for his role in the Limoli murder based on his own statements; be prosecuted for perjury; and be put in mortal peril by being ejected from the Witness Security Program. Thus, confessing that he had previously lied about Ferrara's role in the Limoli murder was strongly against Jordan's interest.

As this confession tended to expose Jordan to criminal liability and exculpate Ferrara, "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement" would have been required for it to be admitted. Fed.R.Evid. 803(4). Jordan made the statement initially to Coleman, whom he particularly trusted. He did not seek to exculpate his brother-in-law, Barone. Rather, his statement would have been helpful to Ferrara, who could not have harmed Jordan as long as Jordan remained in the Witness Security Program. In view of these facts, a competent defense attorney would have expected to be able to get Jordan's statement to the jury through Coleman's testimony if necessary.

As described earlier, the government's Trial Brief would have made it clear to a competent defense attorney that its case concerning the Limoli charges depended primarily, if not exclusively, on Jordan's testimony. *See* Trial Brief at 207–211. Prior to Ferrara's plea, the government disclosed in its Trial Brief that Jordan was cooperating and described in detail his anticipated testimony. *Id.* Jordan was the only witness concerning Limoli identified in the Trial Brief. *Id.* Pretrial discovery revealed that there was no electronic surveillance implicating Ferrara in the Limoli murder. Nor was there any scientific evidence that could be used against him. Thus, it would have been evidence that, as the court repeatedly stated at Barone's trial, Jordan was a crucial witness and his credibility was "essential" to proving the government's case concerning Limoli. *See, e.g.,* Oct. 18, 1993 Barone Tr. at 35–36, 50–51 (the court states, "Walter Jordan's credibility is essential to this case").

It is well-known that the testimony of cooperating witnesses is inherently suspect and often not credited by juries because the witnesses are criminals with obvious incentives to lie to help themselves. As Ninth Circuit Judge Stephen Trott, a former United States Attorney and Assistant Attorney General in charge of the Criminal Division of the Department of Justice, has written:

> Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law.

> \*　　\*　　\*　　\*　　\*　　\*

> Jurors suspect their motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable, openly expressing disgust with the prosecution for making deals with such "scum."

S. Trott, *Words of Warning for Prosecutors Using Criminals As Witnesses,* 47 Hastings L.J. 1381, 1383, 1385 (1996).

Juries in the First Circuit are regularly instructed to consider the testimony of cooperating witnesses "with particular caution." *See* First Circuit Pattern Jury

Instruction 2.07; *United States v. Hernandez*, 109 F.3d 13, 17 (1st Cir.1997) (approving "with greater caution" instruction); *United States v. Brown*, 938 F.2d 1482, 1486 (1st Cir.1991) (referring to standard accomplice jury instruction as "with caution and great care."); *United States v. Paniagua–Ramos*, 251 F.3d 242 (1st Cir.2001). Experience has shown that when a cooperating witness alters his version of events or suffers a lapse of memory, it is very difficult, if not impossible, to obtain a conviction in the absence of strong, corroborating evidence that would have rightly appeared to a competent defense lawyer to have been absent with regard to Ferrara's alleged involvement in the Limoli murder. *See, e.g., Collatos*, 798 F.2d at 19 (cooperating witness was "thoroughly impeached by his 'lack of recall' on cross-examination and [defendant] was subsequently acquitted.").

In this case, it was foreseeable that Jordan would be particularly impeachable, even in the absence of the recantation of his statements and grand jury testimony concerning Ferrara, and his consequent admission of perjury. Later events confirm this assessment. Jordan was cross-examined for at least five days at Barone's trial. At the conclusion of the testimony, the government recognized that its evidence linking Ferrara to the Limoli murder was weak and argued, unsuccessfully, that it did not have to prove that Ferrara ordered Barone to kill Limoli in order to convict Barone of the charges against him concerning Limoli. In any event, it is evident that Jordan was not regarded by the jury as a completely credible witness. The jury twice reported that it was deadlocked. It ultimately found Barone not guilty of actually murdering Limoli and acquitted him on Count 4, thus rejecting a key part of Jordan's testimony. *See United States v. Barone*, 846 F.Supp. 1016, 1017–18 (D.Mass.1994); *Barone*, 114 F.3d at 1288. If informed of Jordan's recantation, competent defense counsel would have properly predicted that a jury was not likely to believe any testimony by Jordan implicating Ferrara in the Limoli murder.

As explained earlier, competent counsel would also have inferred that Limoli's sister, DiNunzio, was on the witness list to testify about his murder. It would have been evident, however, that she was not likely to have any personal knowledge of the events at issue and that getting statements of Limoli admitted through her would be difficult. This too later proved to be correct in the Barone trial. *See Barone*, 114 F.3d at 1291–1303.

Competent defense counsel would also have realized that the government had little evidence to prove that Ferrara had participated in the murders of Corlito or DiFronzo. DiFronzo was murdered in 1977, allegedly by Ferrara and Limoli. Trial Brief at 212. In contrast to the Limoli killing, to which Barone had pled guilty in state court, no one had been prosecuted for the DiFronzo murder. Also in contrast to Limoli, the DiFronzo murder was charged only as a racketeering act and not as a substantive offense. Discovery demonstrated that there was no electronic surveillance or scientific evidence connecting Ferrara with that crime. The only other alleged participant in the DiFronzo murder, Limoli, was dead and therefore obviously unavailable to testify. The description of the evidence concerning the DiFronzo murder in the Trial Brief was limited and general. *Id.* at 211–13. In view of the foregoing, competent defense counsel would have inferred that the government would try to prove Ferrara's involvement in the DiFronzo murder through exceptions to the hearsay rule and that its case was not strong, particularly because it foreseeably relied largely on

Jordan's credibility. *See Barone*, 114 F.3d at 1289.

Corlito was murdered in 1979. Ferrara, Limoli, Barone, and an unidentified fourth person allegedly shot him. Trial Brief at 213. Once again, there had been no state prosecution for that murder, and the crime was charged only as a racketeering act, not as a substantive offense. There also was no electronic surveillance or scientific evidence linking Ferrara to the Corlito murder. The description of the government's evidence concerning Corlito in its Trial Brief was terse and vague. *Id.* at 213–14. Thus, competent defense counsel would have viewed the evidence linking Ferrara to the Corlito murder as weak as well.

Once again, the Barone trial demonstrated the validity of this assessment. At the close of the government's case-in-chief, it barely survived Barone's motion for acquittal on the Corlito murder charge. As described earlier, in denying that motion, the court stated:

> The motion to acquit is genuinely competitive on both the Corlito murder and the Credit Union robbery. I have to look at the evidence in the light most favorable to the government and, basically, Walter Jordan, if believed, says things which I believe are sufficient for those two predicate acts to remain in the case; that is, taking that as a part of all the evidence, if the jury believed it, the jury could find beyond a reasonable doubt that the events occurred and had a sufficient nexus with the alleged RICO enterprise.

Oct. 7, 1993 Barone Tr. at 6–7.

Although interested in reaching a plea agreement with the government, Ferrara's trial counsel now states that Ferrara always asserted to him that he had not ordered Limoli's murder. Nevertheless, at the January 22, 1992 change of plea colloquy, Ferrara admitted to conspiring to murder Limoli. *See* Jan. 22, 1992 Tr. at 61–3. However, as described earlier, the Presentence Report stated that:

> [Ferrara's] admission (in terms of a guilty plea) and having contracted for the death of James Limoli, is particularly troubling to the defendant. In fact, prior to entering the plea, he spoke with the decedent's father, and explained the untenable position he was in and why he found it necessary to acknowledge his involvement in James Limoli['s] death, even though he disavows any planning or participation in the killing.

Presentence Report at 105–06.

Ferrara did not in the change of plea colloquy admit to participating in the Corlito or DiFronzo murders. *See* Jan. 22, 1992 Tr. at 61. In view of Ferrara's plea to the Limoli charges, which generated a Guideline sentencing range of life in prison, the Corlito and DiFronzo charges had no practical effect on the potential sentence. Thus, the government agreed that Ferrara need not plead guilty to those charges. *Id.* Ferrara also did not admit to participating in the Corlito and DiFronzo murders in connection with his sentencing. Rather, the Presentence Report stated that Ferrara insisted that it include the following statement:

> James DiFronzo and Anthony Corlito were "despicable human beings". They were heroin addicts, killers, and James DiFronzo was a rapist. They were in short "low lifes." Without conceding responsibility for their deaths, the defendant "does not care, if people think that (he) did it."

Presentence Report at 105.

Therefore, Ferrara's counsel was advising a defendant who was hoping to achieve an acceptable plea agreement with the government, in part to spare his family the pain that further publicity would cause, but in larger measure to eliminate the risk

of what Ferrara claimed would be a wrongful conviction on one or more murder charges that would require that he serve life in prison. If Jordan's recantation had been disclosed, competent counsel would have regarded the government's likelihood of success in proving the murder charges beyond a reasonable doubt at trial, or even by a preponderance of the evidence at sentencing, to be slim.

As explained earlier, the likely impact of the suppressed information must be assessed objectively, without regard to the idiosyncracies of the particular decision-maker. *See Strickland,* 466 U.S. at 695, 104 S.Ct. 2052; *Hill,* 474 U.S. at 59–60, 106 S.Ct. 366; *Miller,* 848 F.2d at 1323; *Stanley,* 97 Fed.Appx. 180, 181; *Indelicato,* 106 F.Supp.2d at 158. Viewed objectively, there is a reasonable probability that: competent counsel would have advised Ferrara to proceed with the trial that had commenced rather than agree to a twenty-two year sentence; Ferrara, who asserted his actual innocence of those charges, would have agreed; and Ferrara would have prevailed with regard to those charges both at trial and at sentencing. *See Miller,* 848 F.2d at 1320; *Sanchez,* 50 F.3d at 1454; *Stanley,* 97 Fed.Appx. 180, 181; *McCleary,* 1997 WL 215525 at *3. Moreover, the court's confidence in the outcome of Ferrara's case has been completely undermined by the facts revealed in connection with his § 2255 petition.

While not material to the court's analysis, the court finds that, as a practical matter, there is also a reasonable probability that if the government had disclosed Jordan's recantation, the parties would have reached a different plea agreement under which Ferrara would not have been sentenced to more than about 188 months

in prison, the high end of the Guideline range as Ferrara's attorneys calculate it.

Ferrara was very interested in reaching a plea agreement, but not at any price. Plea discussions continued unsuccessfully for two years before concluding after the jury had been empaneled. If properly informed of Jordan's recantation, which confirmed Ferrara's claim to be innocent of the Limoli charges and demonstrated the weakness of the government's contentions that relied on Jordan's credibility, competent defense counsel would have negotiated hard for an agreement that did not require that time be served for Ferrara's alleged involvement in the murders of Limoli, Corlito or DiFronzo.[22]

Competent prosecutors would have realized that their chances of proving Ferrara's involvement in the murder charges at trial or sentencing were poor, and the reasons favoring global plea agreements were strong. As the court found in sentencing Ferrara and his codefendants, the global pleas served several important government interests. *See Carrozza,* 807 F.Supp. at 159–61. These included, but were not limited to: assuring the conviction of defendants who had committed serious crimes, *id.* at 160; averting the manifest risk of a mistrial because Russo was representing himself, *id.;* averting the risk of jury tampering, or jury nullification, as had occurred in other LCN cases, *id.,* at 160–61; protecting the identities of fearful witnesses, *id.* at 161; and permitting the government to devote its limited resources to investigating and prosecuting other crimes, *id.* at 160. Therefore, viewing the matter objectively, it is reasonably probable that competent prosecutors would have agreed to a sentence for Ferrara of no

---

**22.** Although the subjective idiosyncracies of individual attorneys are not relevant, *Miller,* 848 F.2d at 1323, the court notes that Ferrara's counsel, Oscar Goodman, confirms that, "at a minimum, he would have sought a substantial reduction in the sentence that Mr. Ferrara received under the package settlement." Declaration of Oscar Goodman, ¶ 27.

more than about 188 months, and in any event significantly less than 264 months, in order to assure that he and his codefendants would receive long sentences without the need for a trial.[23]

In these circumstances, there is a reasonable probability that Ferrara and the government would have reached a plea agreement that required a sentence of significantly less than twenty-two years for Ferrara. This too would have been "a different result" for the purposes of determining whether the information suppressed by the government was material.

Once again, the tests for *Brady* materiality and ineffective assistance of counsel prejudice claims are the same. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Hill*, 474 U.S. at 57, 106 S.Ct. 366; *Miller*, 848 F.2d at 1321–22; *Ruiz v. United States*, 339 F.3d at 43. In the context of ineffective assistance of counsel claims, a more favorable plea agreement has been deemed to be a different result.

In *Mask v. McGinnis*, 28 F.Supp.2d 122, 123 (S.D.N.Y.1998), the defendant rejected a plea agreement of ten years to life. His attorney incorrectly believed that the defendant would be sentenced as a violent persistent felon offender, and therefore did not correct the prosecutor's similar belief and obtain a more favorable plea offer. *Id.* The defendant was convicted at trial and sentenced to twenty to forty years in prison. *Id.* at 123–24.

In response to a habeas corpus petition, the court held that there was a violation of the defendant's constitutional right to effective assistance of counsel. It wrote that:

> a reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* [*Strickland*] at 694, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Here, petitioner must demonstrate a reasonable probability that, if defense counsel had realized his mistake, not only would the district attorney have offered a more lenient plea offer, but petitioner would have accepted it as well. . . .

> Hence, a reasonable possibility exists that if defense counsel had pointed out that petitioner was not a persistent violent felony offender, additional negotiations would have been pursued and the prosecutor probably would have been willing to offer a sentence lower than ten to life, including a sentence in the range that petitioner would have found reasonable—eight to sixteen years. Under these circumstances, my confidence in the outcome of the proceedings is certainly undermined.

*Id.* at 125–126. The Second Circuit affirmed that decision, writing:

> In this case, there is a large disparity between the defendant's sentence exposure following a trial and his potential exposure had a plea offer been made on the basis of accurate information. This disparity, coupled with Mask's statements that he would have accepted a reasonable offer as credited by the dis-

---

**23.** Herbert, a member of the original Ferrara prosecution team, now asserts that the government would not have agreed to less than a twenty-two year sentence for Ferrara. As the test is an objective one that does not depend on the idiosyncracies of particular lawyers, this subjective contention is not relevant. *See Miller*, 848 F.2d at 1322; *Sanchez*, 50 F.3d at 1454. Based on this court's experience in Ferrara's case, it is also not persuasive. There is no evidence that Herbert was aware of Jordan's recantation and, therefore, if the weakness of the government's case on the murder charges when he formed his view in 1992. Moreover, the government showed great flexibility in its effort to obtain global pleas from the defendants by, for example, renegotiating its agreement with Russo to permit him to deny the existence of the LCN. *See Carrozza*, 807 F.Supp. at 157 n. 2.

trict court, satisfies the prejudice requirement. . . .

*Mask v. McGinnis,* 233 F.3d 132, 142 (2nd Cir.2000). *See also Bone v. Mahoney,* 66 Fed.Appx. 670, 672 (9th Cir.2003) (unpublished) ("The inquiry here, in contrast, is whether there is a reasonable probability that had Bone undergone a mental evaluation he would not have pled guilty or he would have entered into a more favorable plea agreement.").

The failure to disclose exculpatory information in cases in which a defendant would have properly pled guilty in any event may not be material. However, in this case there is a demonstrated reasonable probability that, if necessary, Ferrara would have continued his trial and been acquitted on the murder charges, and that those charges would not have been provable at any sentencing as relevant conduct. Therefore, the fact that a plea agreement more favorable to Ferrara would probably have been reached if Jordan's recantation had been disclosed does not deprive him of his right to relief.

However, even if the subjective, idiosyncratic current claims of the government are credited and the court assumes that it would not have entered into a plea agreement with Ferrara for less than twenty-two years in prison, there is a reasonable probability Ferrara would have continued his trial and received a different, much more favorable result.

As explained earlier, under *Bagley* and it progeny:

"the question is not whether the defendant would more likely than not have received a different [result] with the evidence, but whether in its absence he received [a result] worthy of confidence. A 'reasonable probability of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome.' "

*Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375.).

In this case, the suppression of Jordan's recantation regarding his claim that Ferrara ordered the Limoli murder utterly undermines the court's confidence that Ferrara would have agreed to a twenty-two year sentence in the absence of the government's misconduct. That sentence is more than six years higher than the top of the 151–188 month Guideline range that his attorney asserts would have been generated if he had been convicted of all of the non-murder charges against him. Having grappled with issues relating to the Limoli homicide in the Barone trial and Patriarca sentencing, this court seriously doubts that Ferrara is actually guilty of the charges concerning it. In any event, the court does not believe that the government could have fairly proved those charges, or the charges relating to the murders of DiFronzo and Corlito, either at trial or at sentencing.

Therefore, the information the government suppressed was material, and Ferrara was truly prejudiced by its suppression. *See Miller,* 848 F.2d at 1321–23. As the government failed to produce to Ferrara material exculpatory evidence, it violated its duty under *Brady v. Maryland. See Strickler* 527 U.S. at 281–82, 119 S.Ct. 1936. As a result, Ferrara was denied Due Process and is entitled to an appropriate remedy. *See Miller,* 848 F.2d at 1321–23.

Indeed, this is precisely the situation that the Supreme Court had in mind when it recognized the exception to the rule of the *Brady v. United States,* 397 U.S. at 754, 757–58, 90 S.Ct. 1463, for cases in which guilty pleas had not been entered intelligently because of government misrepresentations or misconduct. *See Miller,* 848 F.2d at 1320. As described earli-

er, in *Brady v. United States*, the Supreme Court wrote that, "[w]e would have serious doubts about this case if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves." 397 U.S. at 758, 90 S.Ct. 1463. The Court, however, was relying on its expectation that defendants, their counsel, and the courts would have the information necessary to assure that guilty pleas are entered intelligently. *Id.* It emphasized that, "[i]n the case before us, nothing in the record impeaches Brady's plea or suggests that his admissions in open court were anything but the truth." *Id.*

In the instant case, the government's suppression of material exculpatory information undermined the safeguards on which the decision in *Brady v. United States* relied, and there is substantial reason to believe that Ferrara falsely pled guilty to the Limoli murder charges to avert a life sentence for that crime. As a result, the court's confidence in the outcome of the plea hearing is completely undermined. The record now impeaches Ferrara's plea to the Limoli charges and indicates his admission to them on January 22, 1992 was not truthful. Denying Ferrara a remedy would not only be fundamentally unfair to him. It would also abet the type of serious government misconduct that the Supreme Court sought to protect against in *Brady v. United States*, 397 U.S. at 757–58, 90 S.Ct. 1463, by expressly creating an exception for guilty pleas tainted by government misrepresentations and other misconduct.

### E. *Remedy*

█ As Ferrara's § 2255 petition is meritorious and he is entitled to relief, the court must exercise its equitable authority to devise an appropriate remedy. In this case, it is most appropriate to vacate the judgment sentencing Ferrara to 264 months in prison and to resentence him.

As the parties and the court agree, the resentencing will be governed by the law as it now exists after the Supreme Court's recent decision in *Booker*, 125 S.Ct. at 757. Therefore, while the Guideline range for Ferrara's sentence should be considered, it is only advisory. *Id.* The court must also consider the statutory factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is reasonable and most appropriate. *Id.* Section 3553(a) directs the court to "impose a sentence sufficient, but not greater than necessary to comply with" specified purposes. Those purposes include: protecting the public from further crimes by the defendant; deterring crimes by him and others; and providing punishment that reflects the seriousness of the offense, provides just punishment for it, and promotes respect for the law. *See* 18 U.S.C. § 3553(a)(2).

For the reasons described below, there is not a proper basis for holding Ferrara responsible at sentencing for the Limoli, Corlito, or DiFronzo murders. Ferrara contends that the Guideline range for his sentence is, therefore, 151–188 months. The government's position is that the Guideline range for the remaining crimes is 210–262 months. As Ferrara has already served more time than a 210–month sentence would have required, the court will conduct promptly a hearing to resolve disputes that affect the Guideline range if Ferrara is not held responsible for any of the murders and to resentence him. The reasons for this remedy are as follows.

28 U.S.C. § 2255 provides, in part, that where, as here:

there has been a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and

shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

With regard to § 2255, the First Circuit has emphasized:

the broad leeway traditionally afforded district courts in the exercise of their § 2255 authority. "The § 2255 remedy is broad and flexible, and entrusts to the courts the power to fashion an appropriate remedy." *United States v. Garcia,* 956 F.2d 41, 45 (4th Cir.1992) (citing *Andrews v. United States,* 373 U.S. 334, 339, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963)). This is so because a district court's power under § 2255 "is derived from the equitable nature of habeas corpus relief." *United States v. Handa,* 122 F.3d 690, 691 (9th Cir.1997) (internal citations omitted); *see also Schlup v. Delo,* 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("[H]abeas corpus is, at its core, an equitable remedy.").

*United States v. Torres–Otero,* 232 F.3d 24, 30 (1st Cir.2000).

■ While the court's discretion to devise an equitable remedy is considerable, it is not unfettered. *See United States v. Gordon,* 156 F.3d 376, 381 (2d Cir.1998). Rather, "the remedy 'should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.'" *Id.* (quoting *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)).

In *Handa,* a decision relied upon by the First Circuit in *Torres–Otero,* the Ninth Circuit wrote that:

When part of [a] sentence is set aside as illegal, the package is "unbundled." After the unbundling the district court is free to put together a new package reflecting its considered judgment as to the punishment the defendant deserves for the crimes of which he is still convicted.

*Handa,* 122 F.3d at 692. This approach is also appropriate in the instant case.

Similarly, where counsel has been ineffective in failing to recommend that the defendant accept a favorable plea agreement, and a retrial would be both impractical and inequitable because of the length of the sentence already served, it has been deemed proper to maintain the conviction and reduce the sentence. *See Boria v. Keane,* 99 F.3d 492, 499 (2d Cir.1996); *see also United States v. Carmichael,* 216 F.3d 224, 227 (2d Cir.2000) (as a result of ineffective assistance of counsel in plea bargaining "the remedy would be the resentencing, if any, to the terms appellant would have received had he been given proper legal advice."). Once again, the principles that emerge from the ineffective assistance of counsel cases are relevant to devising a remedy for the *Brady v. Maryland* violation in this case. *Cf. Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Hill,* 474 U.S. at 57, 106 S.Ct. 366; *Miller,* 848 F.2d at 1321–22; *Ruiz v. United States,* 339 F.3d at 41.

As explained earlier, in this case the government's unlawful suppression of material exculpatory evidence concerning the Limoli murder charges injured Ferrara's counsel's capacity to advise Ferrara effectively; deprived Ferrara of the ability to decide intelligently whether to plead guilty to those charges; and deprived the court of the capacity to assure that there was a proper factual basis for his plea to those charges. It is now most appropriate to maintain Ferrara's conviction on the RICO charges and resentence Ferrara without regard to the murder charges.

More specifically, neither the government nor Ferrara suggests that he be allowed to withdraw his guilty plea and go to trial. *See* Apr. 1, 2004 Tr. at 105–18.

Ferrara and the government both assert that resentencing is the appropriate remedy because it would be impractical and unfair to grant Ferrara a new trial decades after many of the events in question and after he has already served more than fifteen years in prison, a period which there is a reasonable probability is longer than the sentence that would have been imposed if he had been fairly convicted or entered into a plea agreement with knowledge of Jordan's recantation. *Id.*

The parties and the court also agree that Ferrara's resentencing will be governed by the law now in effect as a result of the Supreme Court's recent decision in *Booker, supra.* As the government acknowledges, the *Teague* doctrine does not bar the application of *Booker* to Ferrara's resentencing. *See* Gov. Memorandum Pursuant to Court Order of January 18, 2005 at 6–7.

A defendant whose sole claim for relief under § 2255 is that his constitutional rights were violated when his sentence was enhanced by facts found by a judge at sentencing may have his claim foreclosed by *Teague. See In re Anderson,* 396 F.3d 1336 (11th Cir.2005); *Bey v. United States,* 399 F.3d 1266 (10th Cir.2005). However, as the government has recognized and written:

> This case [ ] stands on a different footing. If the Court determines that the petitioner is entitled to resentencing, it will be on the basis of a perceived violation of the petitioner's constitutional due process rights, such violation relating to the government's alleged failure to disclose exculpatory information to him. In the event that the Court finds that there was an independent constitutional violation that warrants § 2255 relief in the form of resentencing, it seems clear that the Court cannot apply the Guidelines in a manner that has now been determined to be unconstitutional.

Rather, as the second portion of *Booker* instructs, the Guidelines would be advisory.

Gov. Memorandum Pursuant to Court Order of January 18, 2005 at 6–7. The court has now found that the government deprived Ferrara of Due Process, and agrees that *Booker* must govern his resentencing.

The Supreme Court's decision in *Booker:*

> makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a) (Supp.2004).

*Booker,* 125 S.Ct. at 757.

> In the wake of *Booker,* therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still required to "consult [the] Guidelines and take them into account when sentencing," *id.* at 767, 125 S.Ct. 738. Consistent with the remedial scheme set forth in *Booker,* a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence. *See id.* at 764–65. If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so.

*United States v. Hughes,* 401 F.3d 540, 2005 WL 628224 at *4 (4th Cir.2005).

While the parties agree with the methodology to be used to redetermine Ferrara's sentence, they disagree on the Guideline range and the new sentence that should be imposed. Ferrara contends that he should not at resentencing be held re-

sponsible for the Limoli, Corlito and DiFronzo murders. He asserts that without them, the Guideline range for his sentence is 151–188 months. *See* Apr. 1, 2004 Tr. at 105–08. The government agrees that if it has been proven that it suppressed material exculpatory evidence concerning Limoli, the court should vacate Ferrara's convictions on Counts 3 and 4, and on Racketeering Act A–3 of Counts 1 and 2, and resentence him. *Id.* at 108.

It is correct for the government to concede that in circumstances as the court has found them, the new sentence should not be based on the Limoli murder charges. The court has found that the information in Coleman's handwritten memorandum, Exhibit 17, is accurate and that Jordan reported that Barone stated that he did not get permission from Ferrara to murder Limoli. Once again, Jordan was the crucial witness on the Limoli charges. His testimony was essential to proving them at Barone's trial. The court finds that the government cannot now prove the Limoli murder charges even under the preponderance of the evidence standard that may be applicable now that the Guidelines are advisory.[24]

The parties disagree on whether Ferrara should be held responsible at resentencing for the Corlito and DiFronzo murders. More specifically, the government contends that the court at resentencing should find that Ferrara is responsible for those crimes, and that the Guidelines therefore ordinarily contemplate a life sentence. *See* Apr. 1, 2004 Tr. at 108–09. The government argues that the court should again depart downward and reimpose the twenty-two year sentence. *Id.* at 110. The government's position is, however, not persuasive.

With regard to Corlito and DiFronzo, the government proposes that the court consider only the evidence presented at the Barone trial. *See* Apr. 1, 2004 Tr. at 111, 114. The government correctly notes that because at any new trial the only two witnesses concerning Corlito and DiFronzo would be testifying "going on 19 [now 20] years ... after the events ... it would serve no purpose to have Mr. Jordan and Ms. DiNunzio come in now and try to give us their present day recollections of exactly what Mr. Barone and Mr. Limoli said to them." *Id.* at 113–14.

It would, however, not be fair to Ferrara to decide the Corlito and DiFronzo matters solely on the basis of the Barone trial testimony. Ferrara did not participate in that trial and, therefore, his counsel did not have an opportunity to cross-examine Jordan or DiNunzio. In addition, neither of them was fully cross-examined by Barone's counsel because the government unlawfully suppressed the information contained in Coleman's memorandum. Among other things, that memorandum reveals that Jordan had committed perjury.

If disclosed prior to the Barone trial, this information would not only have substantially destroyed Jordan's credibility concerning Ferrara's purported role in the Corlito and DiFronzo murders. It also had the potential to affect DiNunzio's testimony and the jury's assessment of her credibility. DiNunzio may not have initially told the government that Limoli purportedly implicated Ferrara in the Corlito and DiFronzo murders. Rather, she may have provided this information after being led to believe, when the government obtained Jordan's cooperation, that Ferrara

---

**24.** Ferrara contends that, after *Booker,* facts which will enhance a sentence must be proven, to a jury, beyond a reasonable doubt. As the government has failed to prove that Ferrara should be held responsible for the Limoli, Corlito, or DiFronzo murders by even a preponderance of the evidence, this issue is not material.

was responsible for her brother's death. *See* Apr. 1, 2004 Tr. at 76–77. Thus, it is possible that DiNunzio would have testified differently if she had known that Barone had stated that he did not get Ferrara's permission to murder her brother. Accordingly, it would not now be equitable to evaluate DiNunzio's testimony in the Barone case in the same way that it was assessed at that trial.

In any event, the court finds that the evidence presented at the Barone trial is insufficient to prove even by a preponderance that Ferrara should be held responsible for the Corlito and DiFronzo murders. As described earlier, he did not plead guilty to the racketeering acts concerning those murders or admit in the Presentence Report that he committed them. Because the Limoli charges generated a Guideline range of life in prison, the court did not at the 1992 sentencing consider whether Ferrara should be held responsible for those crimes.

As also described earlier, at the Barone trial the court found the evidence concerning the Corlito murder to be weak and the motion to acquit to be "genuinely competitive." Oct. 7, 1993 Barone Tr. at 6–7. However, the court ruled that the evidence was sufficient for those two predicate acts to go to the jury on the legally required assumption that it could find Jordan believable. At that time the court was, pursuant to Federal Rule of Criminal Procedure 29, looking at the evidence in the light most favorable to the government, and resolving all credibility questions and evidentiary conflicts in its favor. *See Serrano*, 870 F.2d at 5. In view of this liberal standard, the value to the administration of justice of jury verdicts, and the court's authority under Rule 29(b) to set aside a jury verdict after trial, this court very rarely grants a Rule 29 motion. Nevertheless, the Corlito and DiFronzo evidence on the charges was deemed barely suffi-

cient to allow them to be presented to the Barone jury. The jury twice declared itself deadlocked before returning verdicts and plainly did not credit all of Jordan's testimony because it did not convict Barone of actually murdering Limoli.

Prior to *Booker*, in the absence of a conviction on a particular charge the court was required to make an independent assessment of the credibility of the evidence and the weight to give whatever evidence it believed to be true. Thus, under the mandatory Guidelines a defendant could have been punished even for alleged conduct that was not proven to a jury beyond a reasonable doubt. *See United States v. Watts*, 519 U.S. 148, 150–57, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). However, Jordan, who was impeached in many ways at the Barone trial, now asserts that he was willing to commit perjury to convict Ferrara. This, among many other things, influences the court not to credit, let alone give meaningful weight to, his Barone trial testimony concerning the Corlito and DiFronzo murders. The hearsay related by DiNunzio does not add enough to prove Ferrara's complicity in those crimes even by a preponderance of the evidence.

Therefore, the court will resentence Ferrara without regard to the impact that the Limoli, Corlito, or DiFronzo murders would have on the Guideline range. There are two disputes which must be resolved to calculate the advisory Guideline range. Ferrara contends that he should be given a two-level downward adjustment for acceptance of responsibility. The government disagrees. Although in view of the binding plea agreement the issue was not material, Ferrara did not in 1992 object to the denial of the potential adjustment for acceptance of responsibility. *See* Apr. 29, 1992 Tr. at 13. Thus, the court's tentative view is that, on the present record at least,

Ferrara should again be denied this adjustment.

The remaining issue relates to the proper adjustment for Ferrara's role in the extortion of Morris Weinstein. The Probation Department recommended a three-level enhancement based on a recommended finding that Ferrara was a manager or supervisor concerning that crime. *See* Presentence Report at 111. The government objected and asserted that Ferrara should have received a four-level adjustment as a leader. *Id.,* Addendum, Gov. Objection 4. Because it did not affect the Guideline range or the sentence to be imposed, the court did not resolve this dispute at Ferrara's sentencing in 1992. If at resentencing Ferrara receives a three-level enhancement and no adjustment for acceptance of responsibility, he will be a 34–III and his advisory Guideline range will be 188–235 months.[25] If the adjustment is raised to four-levels, Ferrara will be a 35–III and his advisory Guideline range will be 210–262 months.

Assuming without finding that the government's positions on acceptance of responsibility and the appropriate adjustment for the Weinstein extortion are correct, 210 months may be the maximum possible reasonable and appropriate sentence for Ferrara. Such a sentence

would have been fully served in February 2005.[26]

More specifically, in its 1992 plea agreement, the government acknowledged that Ferrara deserved a substantial downward departure for his participation in the linked global plea agreements and, after considering the factors described in 18 U.S.C. § 3553(a)(1) and (2), the court agreed. *See Carrozza,* 807 F.Supp. at 161–65. The government has already received the many benefits of that bargain. Among other things it obtained convictions without a lengthy trial, which would have involved the disclosure of fearful witnesses, and inherently had an uncertain outcome. In the circumstances, Ferrara seems to have a compelling argument that he should be sentenced to no more than the low-end of the range as calculated by the government in the absence of the Limoli, Corlito, and DiFronzo murders. The passage of time has prevented him from receiving a downward departure, as was contemplated by his plea agreement and given by agreement to most of his codefendants.

Moreover, the § 3553(a)(1) and (2) factors suggest that a sentence of about 210 months may be the most reasonable and appropriate sentence even if the advisory Guideline range is life in prison.[27]

---

**25.** The court will provide the parties the Probation Department's current, alternative calculations prior to sentencing.

**26.** The Bureau of Prisons calculations regarding Ferrara's release dates based on possible alternative sentences that might have been imposed have been given to the Probation Department and will be provided to the parties prior to Ferrara's resentencing.

**27.** 18 U.S.C. § 3553(a)(1) and (2) states:

Factors to be considered in imposing a sentence-The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in para-

graph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider-(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed-(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

As indicated earlier, § 3553(a) requires that a court "impose a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in paragraph 2 of [§ 3553(a) ]." Ferrara has now served the equivalent of a sentence of more than 210 months.[28]

A sentence of 210 months, or almost eighteen years, is a long sentence that adequately reflects the seriousness of the RICO and other offenses to which Ferrara pled guilty. *See* 18 U.S.C. § 3553(a)(2). The government agreed that a downward departure to a sixteen-year sentence was appropriate for Russo, who was held responsible for murdering Barboza and started with a Guideline range of life in prison. *See Carrozza,* 807 F.Supp. at 158–59. As the court found in accepting the global plea agreements in 1992, a sixteen year sentence for even a RICO offense involving murder is, in the context of this case at least, sufficient to deter a member of the LCN and others who might be tempted to emulate him. *Id.* at 163–64.

Nevertheless, the court would not exercise its discretion to release Ferrara now if it were proven that he is likely be a danger to the community. However, the court notes that Ferrara is now fifty-five years old. He reportedly has medical problems. *See* Apr. 1, 2003 Tr. at 107. After observing Ferrara over almost fifteen years, it is evident to the court that the many years he has been in prison has been very hard on Ferrara's health.

Echoing arguments made at his 1992 sentencing, *see* Apr. 29, 1992 Tr. at 46, his counsel now assert that Ferrara:

> just wants to get back out of the labyrinths of the Bureau of Prisons to a position where he can have a decent and stable and legitimate and responsible life. He has the potential to be a responsible citizen, and he is determined to do it.

Apr. 1, 2004 Tr. at 107–8. Ferrara is a graduate of Boston College. He is intelligent enough to recognize that it would not only be wrong, it would be very unwise for him to return to a life of crime when he is released. As the court said in sentencing Ferrara in 1992, the Patriarca Family has been decimated. *See Carrozza,* 807 F.Supp. at 164. Moreover, "[when] released, the defendant[ ] will be on supervised release for [ ] five years. Should [he] commit another crime, or indeed associate with his codefendants or any other felons, it is virtually certain that he will be caught and again sentenced to prison." *Id.* In these circumstances, a sentence of about 210 months appears likely to be sufficient to reasonably assure the safety of the community and to provide just punishment.

In essence, the court found in 1992 that sentences including the sixteen-year sentence for Russo fully satisfied the statutory purposes of sentencing set forth in § 3553(a)(1) and (2). *See Carrozza, supra.* It now appears that a sentence of about eighteen years for Ferrara should also fully satisfy those purposes.

Such a sentence should also promote respect for the law. *See* § 3553(a)(2)(A). It will assure that Ferrara does not serve more time than necessary or appropriate because the government's unlawful conduct corrupted the plea in this case, and has made it impossible to conduct now either a trial or an evidentiary hearing to determine the true facts concerning the Limoli, Corlito, and DiFronzo murders.

Ferrara has now served more than fifteen years in prison. As described earlier, if he had been sentenced to 188 months he

---

**28.** The Bureau of Prison advises that Ferrara has earned all available "good time" credits, which result in a 15% reduction in his sentence after the first year. *See* 18 U.S.C. § 3624(b).

would have been released in July 2003, and if he had been sentenced to 210 months he would have been released in February 2005. Therefore, the government's misconduct has already caused Ferrara to serve more time in prison than is likely to have been required if Jordan's recantation had not been unlawfully suppressed. Indeed, if Ferrara's contention is correct and his properly calculated Guideline range would in 1992 have been 151–188 months, the government's unlawful conduct has caused him to serve at least several extra years in prison.[29]

Thus, this case is comparable to *Boria,* 99 F.3d at 499, in which the ineffectiveness of his counsel caused the defendant to serve more time than he would have served if he had been adequately represented with regard to the proposed plea agreement. In *Boria,* the judgment of conviction was not disturbed, but the petitioner's sentence was reduced to time served and he was discharged. *Id.*

Once again, in this case the government's unlawful suppression of evidence: deprived Ferrara's counsel of the ability to advise his client adequately; deprived Ferrara of the information necessary to decide intelligently whether to plead guilty to the Limoli murder charges; and deprived the court of the information necessary to assure that there was a proper factual basis for Ferrara's plea of guilty to those charges. The government's misconduct utterly undermines the court's confidence in the outcome of Ferrara's case. Reducing Ferrara's sentence will be a remedy tailored to the constitutional violation, which does not unnecessarily infringe upon other legitimate interests. *See Morrison,* 449 U.S. at 364, 101 S.Ct. 665; *Gordon,* 156 F.3d at 381. It is, therefore, the remedy being ordered.

## IV. CONCLUSION

The resentencing of Ferrara may result in Ferrara's prompt release. It may also generate litigation concerning whether his release should be stayed pending a possible appeal. The court will provide an opportunity for the government to consider this question and for the parties to brief the issue of a stay if necessary.

It should be noted that the government has at times acknowledged that it had improperly deprived defendants of material exculpatory evidence and agreed that they were entitled to an appropriate remedy. For example, following the first trial of alleged terrorists after September 11, 2001, in 2004 the Department of Justice agreed that highly publicized convictions in Michigan should be vacated. *See United States v. Koubriti,* 336 F.Supp.2d 676 (E.D.Mich.2004). As the United States Attorney for the Eastern District of Michigan wrote in that case:

> [T]he government has concluded that there is no reasonable possibility that it could endure further hearings and emerge with the convictions intact. In its best light, the record would show that the prosecution committed a pattern of mistakes and oversights that deprived the defendants of discoverable evidence (including impeachment material) and created a record filled with misleading inferences that such material did not exist. Accordingly, the government believes that it should not prolong the resolution of this matter pursuing hearings it has no reasonable prospect of winning.

*United States v. Karim Koubriti, et al.,* Cr. No. 01–80778 (E.D.Mich.), Gov. Consolidated Response Concurring in The Defendants' Motions for a New Trial (Aug.

---

**29.** If Ferrara's twenty-two year sentence is not reduced and he continued to earn good time credits, he would be released in January 2009.

31, 2004). Therefore, the government moved for the dismissal of all of the terrorism-related charges and agreed that the defendants should be granted a new trial on the remaining charges concerning alleged fraudulent documents. *See Koubriti, supra.*

In granting those motions, the court stated that:

> [T]he position the government has now taken—confessing prosecutorial error and acquiescing in most of the relief sought by the Defendants—is not only the legally and ethically correct decision, it is in the highest and best tradition of Department of Justice attorneys. Given the nature and background of this case, the Government's decision could not have been an easy one and, no doubt, is one that will come in for criticism and second-guessing from some quarters. However, it is the right decision.

*Id.* at 679. The government subsequently agreed that a defendant who had been detained for more than three years should be sentenced to six months in prison, the maximum time permitted by the Guidelines, and released. *See* David Ashenfelter, *One Time Terrorist Gets Apology from Judge,* The Detroit News, Mar. 23, 2005. In imposing that sentence, the judge stated to the defendant:

> I would be remiss if I did not say that the procedures that are normally followed in criminal cases were not followed in your case, and for that you have the apology of the United States Government. . . . Some of the procedures failed you and, unfortunately, failed the system in this case.

*Id.*

As described earlier, in October 2003, in the companion case to Ferrara's, the government agreed to Barone's immediate release from prison. It did not, however, then agree that Ferrara's release was also justified. Therefore, Ferrara's incarceration has been prolonged to a point where it has now likely exceeded the sentence that would have been imposed in the absence of the government's unconstitutional conduct, and the extensive analysis in this Memorandum has been necessary.

Because Ferrara may now be suffering irreparable harm as a result of the government's misconduct, the court is ordering that the parties confer and inform the court whether the government will be seeking a stay pending appeal if Ferrara is resentenced to time served. If so, the parties will have to submit memoranda addressing whether such a stay should be granted. *See Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Canterbury Liquors & Pantry v. Sullivan,* 999 F.Supp. 144, 149–52 (D.Mass.1998).

## V.  ORDER

In view of the foregoing, it is hereby ORDERED that:

1.  Vincent M. Ferrara's First Amended Motion Pursuant to 28 U.S.C. § 2255 to Vacate and Set Aside Sentence is ALLOWED.

2.  The parties shall confer and, by April 20, 2005, inform the court whether they have agreed to a resolution of this case and, if not, whether the government requests a stay of Ferrara's release pending appeal.

3.  If they have not agreed to a resolution of this case, the parties shall, by April 27, 2005, file memoranda addressing what sentence consistent with the findings in this Memorandum should be imposed at resentencing and, if necessary, whether a stay pending appeal should be granted.

4.  A hearing at which Ferrara will be resentenced in conformity with this Memo-

randum and Order shall be held on May 3, 2005, at 10:00 a.m.